**ARNOLD J. RODIN, INC.,**
**Plaintiff-Appellant,**

v.

**The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY,**
**Defendant-Appellee.**

**No. 72-2605.**

United States Court of Appeals,
Fifth Circuit.

April 30, 1973.

John C. North, Jr., Corpus Christi, Tex., for plaintiff-appellant.

Joe B. Cunningham, Fort Worth, Tex., for defendant-appellee.

Before RIVES, GOLDBERG and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

Appellant Rodin, plaintiff below, sued the Atchison, Topeka & Santa Fe Rail-

way Company to recover damages to 82 carloads of potatoes shipped out of Maine during May of 1968. The railroad filed a cross-action and counterclaim for freight charges. The jury found in favor of the defendant railroad on Rodin's damage claim. The trial judge rendered a verdict for the railroad on its cross-action and counterclaim. We affirm.

Appellant Rodin was a speculator in potatoes on the New York Mercantile Exchange dealing with up to 5,000 carloads of potatoes a year. His usual practice was to purchase contracts for future delivery and sell these contracts prior to their delivery date. In fact, over the 10-year period prior to this action, Rodin had only accepted for delivery a total of 100 cars from the New York Mercantile Exchange. Rodin's previous experience in actually selling potatoes had been limited to the Detroit, Michigan, area where he lived, but he did appear to have a certain amount of knowledge as to the effect of time and temperature on these commodities.[1]

In early 1968, appellant Rodin purchased contracts for 1,200 carloads of Maine potatoes to be delivered on May 10, 1968. The delivery date arrived before resale of these contracts and Rodin became the owner of 1,200 carloads of potatoes located across the State of Maine. The heretofore neglected potatoes now began to receive Rodin's careful attention.

In hopes of finding a buyer for these potatoes, Rodin began shipping them all over the Eastern Seaboard. They were shipped to the primary market areas first: Boston, New York, Cleveland, and Detroit. When there was no market there, Rodin began shipping his potatoes to other locations, including Atlanta, Georgia; Miami, Florida; Pennsylvania; New Jersey; Ohio; Illinois; Minnesota; and Texas.

Success in the potato market continually eluded Rodin and as a result 731 carloads, or 62 percent of his potatoes, could not be sold at all. For the carloads he did manage to sell he received less than $500.00 for 131 of them, between $500.00 and $1,000.00 for 132 carloads; between $1,000.00 and $1,500.00 for 180; and for three of his cars he received between $1,500.00 and $1,900.00. During the trial below Rodin asserted that the value of each of the 82 cars in question was $3,000.00. Rodin has filed damage claims in other courts against the various railroads transporting 600 to 800 of his other cars.

The action below involves 82 of 165 to 175 cars that eventually found their way to Chicago. Upon arrival in Chicago the potatoes were inspected by an employee of Rodin, Mooney Gendelman. Gendelman was hired to inspect all cars that came into Chicago belonging to Rodin. He testified at the trial that he inspected all of the 82 cars concerned when they arrived in Chicago and found them to be in poor condition. Rodin was unperturbed and his agent sought out buyers in Chicago—none were found. Finally, Northwest Railroad requested Rodin to divert his cars to another location because of their condition. When these cars finally left Chicago for Texas, 56 of the 82 had been sitting in the railroad yard for over 25 days. This was during the months of May and June.

Rodin testified below that his purpose in reconsigning the potatoes to Texas was to reconstitute them and thereby mitigate damages.

Upon arrival at Amarillo, Texas, the potatoes had no market value and were abandoned to the carrier.[2] Rodin then

---

1. Rodin testified at trial that he knew that he only had 30 to 45 days to sell these potatoes before they would begin normal sprouting leading to severe damage.

2. The court feels it necessary to elaborate on what was wrong with these potatoes when they arrived in Amarillo. Maine potatoes are harvested in September and

brought suit for the value of these potatoes, alleging at trial that upon delivery to the originating carrier in Maine the potatoes were in good condition but upon arrival in Chicago they were in poor condition and could not be sold for an amount equal to the freight charges due at that time.[3] Rodin further contended that had the potatoes arrived in Chicago in good condition they could have been sold with no difficulty. He also maintains that the potatoes were reconsigned to Amarillo, Texas, in order that they be reconstituted and thereby mitigate damages. When they arrived in Texas, however, they were worthless. During the trial below it appears that the jury found that the condition of the potatoes was due to no fault on the part of the railroad, but rather was due to fault on the part of Rodin because of the various delays in shipping attributable to him, improper shipping instructions and lack of knowledge of how to deal with these commodities

This court has considered all allegations of error by appellant Rodin and finds it necessary to address only those set out below.

## I.

■ Appellant contends that the court below erred in trying this case and submitting it to the jury as though it were a tort action rather than a suit in contract. Appellant apparently bases this contention upon part of the trial judge's charge to the jury which mentioned negligence as follows:

If the potatoes were in fact delivered in good condition and arrived at their destination in a worsened condi-

tion, the carriers must prove that they were not *negligent* in their handling of the potatoes and that the worsened condition was due solely to a combination of faults or inadequacies in the bills of lading and the transportation service requested by Rodin and to some inherent defect in the potatoes themselves. (Emphasis added).

This court following the Supreme Court in Missouri P. R. Co. v. Elmore & Stahl, 377 U.S. 134, 84 S.Ct. 1142, 12 L. Ed.2d 194 (1964), finds the trial judge's instruction to have been proper. The Court in *Elmore & Stahl* stated:

. . . [I]n an action to recover from a carrier for damage to a shipment, the shipper establishes his prima facie case when he shows delivery in good condition, arrival in damaged condition, and the amount of damages. Thereupon, the burden of proof is upon the carrier to show both that it was free from *negligence* and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability. (Emphasis added). Missouri P. R. Co. v. Elmore & Stahl, supra.

We find that it was in this manner that the trial judge properly instructed the jury and that no change from trying the case in contract to trying it in tort took place. See Atlantic Coast Line R. Co. v. Georgia Packing Co., 5 Cir. 1947, 164 F.2d 1, and Austin v. Seaboard Air Line R. Co., 5 Cir. 1951, 188 F.2d 239.

## II.

■ Appellant further maintains that the district court's charge to the

October, and once they start sprouting they must be kept at a temperature of 40 to 48 degrees or else they will sprout rapidly. The potatoes Rodin purchased were orginally classified as U.S. No. 1 by USDA inspection at their point of origin. Sprouting potatoes remain U.S. No. 1 unless more than ten percent have spouts over three-quarters of an inch long. When these potatoes arrived in Amarillo they were not U.S. No. 1 for two reasons:

sprouting and soft rot (soft rot and sprouting are caused usually by the same factors, age and exposure to excessive temperature).

3. It is interesting to note that Rodin started protesting the condition of the potatoes and abandoned these potatoes before all of the carloads of potatoes had arrived in Amarillo.

jury on Special Issue No. 1 placed the burden of proof of the entire case on the plaintiff-appellant and was, therefore, error. The judge below instructed the jury on Special Issue No. 1 as follows:

> Do you find from a preponderance of the evidence that the potatoes in any of the 82 cars were in such condition on the date of the bills of lading that, based upon the instructions given by Rodin to the carriers for their transportation, and the reasonable performance of those instructions by the carriers, the potatoes would have been reasonably expected to arrive at the final destination in good merchantable condition?

This court does not find the burden of proof to have shifted. The trial judge had in previous instructions explained to the jury that when a prima facie case was shown by the plaintiff-shipper,[4] then the burden is shifted to the carrier to show that it was free from negligence and that the damage to the cargo was due to one of the excepted causes, relieving the carrier of liability. We do not feel that these instructions as to Special Issue No. 1 had the effect of shifting the burden of proof. It appears that the judge below was complying with the Supreme Court's decision in *Elmore & Stahl.* The Court there stated that the general rule in the case of perishables places the affirmative burden on the carrier of bringing the cause of damage within one of the specified exceptions. Missouri Pacific R. Co. v. Elmore & Stahl, supra, 377 U.S. at 138, 84 S.Ct. 1142. The trial judge's instructions were intended to do just that. See Atlantic Coast Line R. Co. v. Georgia Packing Co., supra.

### III.

■ Appellant asserts that the court below erred in admitting testimony concerning the 1,200 cars originally purchased and shipped by the plaintiff because they are not involved in this action. Rodin, however, at trial, during direct examination originally introduced evidence as to these 1,200 carloads of potatoes.[5] Only after Rodin had mentioned this during his direct testimony did the defendant ask questions concerning these cars on cross-examination. This appears to be well within the rule concerning scope of cross-examination in use in state and federal courts today.[6]

The appellant's brief complains that testimony as to the value of the goods at point of origin was immaterial to this case. Appellant alleges it should not have been admitted at trial because of possible differences in freight charges and running time which could affect the actual value to the shipper at destination.

4. What must be proved by a shipper to recover damages from a carrier is that the goods were delivered in good condition, that they arrived in damaged condition, and the amount of damages. The trial judge's instruction quoted in Part I of this opinion appears sufficient to have covered the prima facie case facts in that situation.

5. The questions and answers by Rodin and his counsel were as follows:

Q: . . . I will ask you if you did, in May of 1968, purchase on the New York Mercantile Exchange any cars of potatoes?

A: Yes, sir.

Q: Approximately how many?

A: There were a total of a thousand— 1,200 cars.

6. The so-called American Rule followed in most states and in the federal courts limits the cross-examination to matters included within the scope of the direct examination. Houghton v. Jones, 1 Wall (U.S.) 702, 17 L.Ed. 503; Philadelphia & T. R. Co. v. Stimpson, 14 Pet. (U.S.) 448, 10 L.Ed. 535.

The English rule presently used in the state courts of Texas permits a witness called by one party to be cross-examined on any issue involved in the case in chief whether it was brought up on direct examination or not. Continental Casualty Company v. Thomas, 463 S.W.2d 501 (Tex.Civ.App.1971).

First, it does not appear to this court that at trial such information was elicited from Rodin for the purpose of determining cost comparisons as alleged by appellant. Rather, it appears that appellee attempted to demonstrate that these 82 cars were not the only cars Rodin had trouble with as he had implied in earlier testimony. Secondly, the limit of cross-examination, especially as to matters already brought forth during direct examination is well within the discretion of the trial judge. District of Columbia v. Clawans, 300 U.S. 617, 57 S.Ct. 660, 81 L.Ed. 843 (1937). Here we find no abuse of that discretion whatsoever.

## IV.

Appellant further insists that the court erred in instructing the jury that the final destination of the cars was Amarillo, Texas. Appellant argues that the court thus completely deprived appellant of presenting the entire basis of its case, that is, that Chicago, Illinois, was the original destination of the 82 cars and upon arrival there in poor condition they were diverted by appellant to Amarillo in order to mitigate damages.

This contention on the part of appellant presents this court with a rather puzzling issue. If the plaintiff's contention is accepted and the trial court is found to be in error as to its instructions that Amarillo was the final destination, then the appellant, in fact, has no case under the Carmack Amendment, 49 U.S.C. § 20(11),[7] against this defendant railroad.

The appellant asserts that Chicago should have been considered the final destination point of the potatoes. After the potatoes arrived in Chicago the appellant's agent inspected the potatoes and found them to be in unsatisfactory

---

7. The pertinent part of § 20(11) reads as follows:

§ 20, par. (11). *Liability of initial and delivering carrier for loss; limitation of liability; notice and filing of claim.* Any common carrier, railroad, or transportation company subject to the provisions of this chapter receiving property for transportation from a point in one State or Territory or the District of Columbia to a point in another State, Territory, District of Columbia, or from any point in the United States to a point in an adjacent foreign country shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, and no contract, receipt, rule, regulation, or other limitation of any character whatsoever shall exempt such common carrier, railroad, or transportation company from the liability imposed; and any such common carrier, railroad, or transportation company so receiving property for transportation from a point in one State, Territory, or the District of Columbia, to a point in another State or Territory, or from a point in a State or Territory to a point in the District of Columbia, or from any point in the United States to a point in the District of Columbia, or from any point in the United States to a point in an adjacent foreign country, or for transportation wholly within a Territory, or any common carrier, railroad or, transportation company delivering said property so received and transported shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage, or injury to such property caused by it or by such common carrier, railroad, or transportation company to which such property may be delivered, or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission; and any such limitation, without respect to the manner or form in which it is sought to be made is declared to be unlawful and void. . . .

condition. At that point the appellant unquestionably had full knowledge of the defect in its goods. With that knowledge, the appellant chose to reconsign the potatoes to Amarillo. The Atchison, Topeka & Santa Fe Railway Company did not enter the picture then until after the appellant had full knowledge that his potatoes were in damaged condition. If Chicago is then considered to be the destination under the Carmack Amendment, then the record demonstrates that the railroad received damaged goods and the appellant has no case.

■ ■ Under the Carmack Amendment the holder of the bill of lading is given a cause of action only against the receiving or delivering carrier. The purpose of the Carmack Amendment was to make the initial and delivering carriers responsible so that the lawful holder of a bill of lading does not have to search out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods. The initial or delivering carrier could then recover damages from the connecting carrier on whose line the loss or damage to the property was sustained. Therefore, if the court below had taken the position that Chicago was the point of destination, then there would be no reason for the Atchison, Topeka & Santa Fe Railway Company to be party to this suit at all. The defendant railroad would then neither be the receiving, the connecting nor the delivery carrier under the Carmack Amendment.

Any contra interpretation of Carmack would allow a shipper who has discovered that his goods were damaged to shop around for a solvent carrier on which it could ship its damaged goods and later sue to recover those damages.

This court, after considering all of the allegations of the appellant as to error by the trial court below, finds that the trial court was correct and is therefore

Affirmed.