SEASON–ALL INDUSTRIES,
INC., Plaintiff,

v.

MERCHANT SHIPPERS, Defendant and
Third-Party Plaintiff,

v.

BREMAN'S EXPRESS, INC., Baltimore &
Ohio Railroad Company, Penn Central
Transportation Company, Burlington
Northern, Inc. and Alaska Railroad
Company, Third-Party Defendants.

Civ. A. No. 74–264.

United States District Court,
W. D. Pennsylvania.

May 26, 1978.

Thomas J. Reinstadler, Pittsburgh, Pa., for plaintiff.

Paul H. Titus, Pittsburgh, Pa., for Merchant Shippers.

Edward Goldberg, Pittsburgh, Pa., for Breman's Express.

Aloysius F. Mahler, Pittsburgh, Pa., for Penn Central.

John J. Repcheck, Pittsburgh, Pa., for B & O R. R.

Fredrick J. Francis, Pittsburgh, Pa., for Burlington Northern.

Joel B. Strauss, Asst. U. S. Atty., Pittsburgh, Pa., for Alaska R. Co.

## OPINION

WEBER, Chief Judge.

This is a suit for damages to a shipment of storm windows originating in Indiana, Pennsylvania, and terminating in Fairbanks, Alaska. The background of this dispute is fully set forth in our opinion at 417 F.Supp. 998 [W.D.Pa.1976] and will not be repeated here. However, for reference we briefly state that plaintiff Season-All Industries, Inc. (Season-All) is the manufacturer of the windows and shipper; defendant Merchant Shippers is a freight-forwarder who arranged for the transportation of the shipment from plaintiff's plant in Indiana, Pa. to Fairbanks, Alaska; and the third-party defendants are all common carriers who took some part in the transportation of the shipment. Breman's Express, Inc. (Breman's) hauled the seven trailers by truck from Indiana Pa. to Merchant Shippers' terminal in Pittsburgh, Pa. and thence to the Pittsburgh terminals of the Baltimore & Ohio Railroad Company (B&O) and Penn Central Transportation Company (Penn Central). B&O transported five of the trailers "piggy back" to Chicago, and Penn Central the other two. Burlington Northern, Inc. (Burglington Northern) transported the trailers from Chicago, Illinois, to Seattle, Washington. The trailers were sealed in Pittsburgh, and remained sealed until delivered to Merchant Shippers' terminal in Seattle. Merchant Shippers reloaded the shipment into railroad boxcars. Burlington Northern then switched or transported the cars to dockside of Puget Sound Tug & Barge Company, where they were loaded onto barges for transport to Alaska. Substantial damage was discovered in Seattle at the time of the re-packing, prior to the delivery to Puget Sound Tug & Barge Co. Puget Sound transported the cars to Whittier, Alaska, where the Alaska Railroad Company (Alaska Railroad) received them and transported them to destination. The shipment was found to be damaged extensively when it arrived at Fairbanks, Alaska, and it was returned to Merchant Shippers' terminal in Seattle. Of the various carriers, only Puget Sound is not a party to this lawsuit, as jurisdiction over it could not be obtained.

We previously granted summary judgment in favor of Alaska Railroad and Burlington Northern as to Merchant Shippers' claims against them, but denied summary judgment as to Merchant Shippers' claim against Breman's, who we held to be an initial carrier under the Carmack Amendment, 49 U.S.C. § 20(11). B&O and Penn Central have moved for summary judgment as to Merchant Shippers' third-party claims against them, and B&O, Penn Central, Burlington Northern, and Alaska Railroad have moved for summary judgment on the cross-claims of Breman's. Breman's, by answer to the motions, requests us to re-consider the previous opinion. Breman's does not have a direct interest in the claims of Merchant Shippers against the other third-party defendants, but our legal conclusions on these other motions will affect Breman's.

We conclude that the entry of summary judgment on any claim would be imprudent at this time, except for Breman's cross-claim against Alaska Railroad, and that the case should proceed to trial with all parties present and all claims open. We also conclude that our entry of summary judgment on August 10, 1976 on the third-party claims of Merchant Shippers against Burlington Northern and Alaska Railroad should be vacated. While some of the claims raise difficult problems of proof, we cannot say there is no genuine issue of material fact.

## I.

There is relatively little dispute as to the general principles applicable to this case, but the task of applying 49 U.S.C. §§ 20(11) and 20(12), and the freight forwarders act, 49 U.S.C. §§ 1001–1022, is not an easy one. Some of the difficulty is perhaps caused by the role played by the freight-forwarder Merchant Shippers. Despite the issuance of a through bill of lading by the first carrier Breman's, see 49 U.S.C. § 1013, Merchant Shippers assumed an active role in the handling and shipping of the cargo, particularly in receiving the cargo in Seattle, Washington, and there re-packing it from truck trailers to railroad boxcars.

■ Initially, we re-affirm our earlier determination that with respect to Merchant Shippers, Breman's is an initial carrier under the Carmack Amendment, 49 U.S.C.A. § 20(11). Our reasons for this are fully set forth in our previous opinion, 417 F.Supp. at 1004, and we note now only that the freight-forwarder Merchant Shippers occupies two positions: as to the owner-shipper Season-All, it is treated as the initial and delivering carriers, but in relation to actual carriers, it is to be treated as a shipper, *Chicago, Milwaukee, St. Paul & Pacific Railroad Co. v. Acme Fast Freight*, 336 U.S. 465, 69 S.Ct. 692, 93 L.Ed. 817 [1949]. However, we conclude that Breman's liability is in all events limited to any damage occurring between Indiana, Pennsylvania, and Seattle, Washington, and that Breman's liability may possibly terminate in Pittsburgh, where it delivered the shipment into the control of Merchant Shippers.

■ Breman's is not relieved from liability merely by the subsequent issuance of additional bills of lading by the connecting carriers for the passage of the cargo over their own lines. As stated in *Mexican Light and Power Co. v. Texas Mexican Ry. Co.*, 331 U.S. 731, 734, 67 S.Ct. 1440, 1441, 91 L.Ed. 1779 [1947]:

"No matter what the convenience which a consignee may derive from a bill of lading issued by a connecting carrier on a through shipment unless the connecting carrier has received a consideration for the bill of lading in addition to that which flowed under the bill of lading issued by the initiating carrier, the Carmack Amendment makes such second bill of lading void. It can neither enlarge the liability of the connecting carrier nor contract that of the initiating carrier."

■ However, as Merchant Shippers admits, since Merchant Shippers terminated the piggy-back shipment in Seattle and there re-claimed possession and control of the goods, Breman's is liable to it only for those damages attributed to the movement of the shipment between Indiana, Pa. and Seattle, Washington.

This result follows not from any explicit authority cited by the parties, but from the general purposes and effects of the Carmack Amendment. We start with *Atlantic Coast Line R. Co. v. Riverside Mills*, 219 U.S. 186, 203, 31 S.Ct. 164, 169, 55 L.Ed. 167 [1911], where it said:

"The rule is adapted to secure the rights of the shipper by securing unity of transportation with unity of responsibility. The regulation is one which also facilitates the remedy of one who sustains a loss, by localizing the responsible carrier."

*Reider v. Thompson*, 339 U.S. 113, 119, 70 S.Ct. 499, 502, 94 L.Ed. 698 [1950], states:

"The purpose of the Carmack Amendment was to relieve shippers of the burden of searching out a particular negligent carrier from among numerous carriers handling an interstate shipment."

The effect of the Amendment has been noted;

"The indisputable effect of the Carmack amendment is to hold the initial carrier engaged in interstate commerce and 're-ceiving property for transportation from a point in one state to a point in another state' as having contracted for through carriage to the point of destination, using the lines of connecting carriers as its agents." *Atlantic Coast Line R. Co. v. Riverside Mills*, supra, 219 U.S. at page 196, 31 S.Ct. at page 166

■ Merchant Shippers re-claimed possession and control of the shipment in Seat-

tle. There it re-loaded the shipment into boxcars, and had a full opportunity to inspect it. No useful purpose would be served by extending Breman's liability as an ·initial carrier beyond this point, regardless of its issuance of a bill of lading with the destination in Fairbanks, Alaska. The purpose of the Carmack Amendment is to establish liability on the initial and delivery carriers, and to place the burden on these carriers to recover their losses from the connecting carriers on whose lines the damages occurred. Once the shipper regains possession of the shipment and opens it and can see its condition, neither law nor logic requires the carriers to incur further liability for injuries to the shipment occurring beyond that point. *Accord, Arnold J. Rodin, Inc. .v. Atchison, Topeka & Santa Fe Ry. Co.*, 477 F.2d 682 [5th Cir. 1973]. Nor would this result be different under the common law. We therefore re-affirm our determination in our previous opinion that the shipment terminated in Seattle and a new shipment began there. 417 F.Supp. at 1002.

Extending this logic to its limits requires us to take a closer look at the occurrences at Pittsburgh. It appears from the record that Breman's hauled the trailers to Merchant Shippers' terminal in Pittsburgh where a Merchant Shippers employee removed the seals, looked into the trailer and then re-applied seals. Thus, as in Seattle, the carrier delivered the goods into the hands of the shipper-consignee, and the question must be asked whether the original shipment terminated at that point and a new shipment began. The inspection by Merchant Shippers appears to have been most cursory, but it clearly had some opportunity to inspect the cargo and did make a limited inspection. We do not suggest a duty on the freight forwarder to unload and inspect a shipment every time the shipment is docked at its terminal. Perhaps such a duty, if there is one, would be limited to exclude cases where there is no outward manifestation of damage and the shipment is under seal. See *Blue Bird Food Products Co. v. B. & O. R. Co.*, 474 F.2d 102 [3d Cir 1973], and 492 F.9d 1329 [3d Cir.

1974]. Since this possibility exists, however, it appears unwise to dismiss any of the parties. The reasons for this appear below.

■ First, however, we note that the possibility of a new shipment beginning in Pittsburgh leads to the same result as Breman's argument that it acted simply as Merchant Shippers' agent in the Indiana-Pittsburgh carriage and that it cannot, therefore, be deemed the initial carrier under the Carmack Amendment. We reject this argument as a general proposition as it overlooks Merchant Shippers' role as a shipper entitled to rely on the Carmack Amendment. However, Merchant Shippers' active role in the handling of this shipment, particularly in receiving and perhaps inspecting the shipment in Pittsburgh, does raise the possibility of a new shipment beginning in Pittsburgh. Whether a carrier is an initial, connecting or terminal carrier is always a factual matter that · depends on a number of circumstances; see generally, *United States v. Mississippi Valley Barge Line Co.*, 285 F.2d 381, 393 [8th Cir. 1960].

If the facts do show a new shipment originating in Pittsburgh, B&O and Penn Central may become liable as initial carriers. Such liability could flow even though they issued no through bill of lading, if they were required to issue one, 49 U.S.C. § 20(11).

B&O and Penn Central contend that they cannot be found liable because they each received the shipments under seal and there is no proof of delivery to them in good condition. *Blue Bird Food Products Co. v. B & O. R. Co.*, 474 F.2d 102 [3d Cir. 1973] and 492 F.2d 1329 [3d Cir. 1974], does create difficult problems of proof for Merchant Shippers. Some of the third-party defendants perhaps read too much into *Blue Bird*, however. *Blue Bird* sustained the trial court's ruling that delivery in good condition was not established merely by a representation to that effect in the bill of lading where the trailers were received under seal, and held that in the absence of contrary arrangements the carrier is under no duty

to break the seal to inspect. *Blue Bird* did not hold, however, that the shipper cannot establish delivery in good condition by testimony of its own agents who examined the shipment immediately prior to delivery to the carrier.

## II.

Since we have determined that the original shipments terminated in Seattle, it is suggested that Burlington Northern, therefore, became the "delivering carrier" under the Carmack Amendment. The only definition of delivering carrier in the Carmack Amendment is the proviso that:

"* * * the delivering carrier shall be construed to be the carrier performing the line-haul service nearest to the point of destination and not a carrier performing merely a switching service at the point of destination: * * *"

This section distinguishes between a line-haul carrier and a switching operator, and therefore gives only peripheral guidance in determining which line-haul carrier is the "delivering carrier". However, it is noteworthy that the statute makes no explicit requirement that the delivering carrier be named as such in the bill of lading. Burlington Northern is the only carrier that could logically be considered the delivering carrier on the shipment terminating in Seattle. *Cf. Arnold J. Rodin, Inc. v. Atchison, Topeka & Santa Fe Ry. Co*, 477 F.2d 682 [5th Cir. 1973].

Of course, even if Burlington Northern "qualifies" as the delivering carrier, Merchant Shippers is faced with the restriction in 20(11) that:

"* * * all actions brought under and by virtue of this paragraph against the delivering carrier shall be brought and maintained, if in a district court of the United States, only in a district . . . through or into which the defendant carrier operates a line of railroad * * *".

Burlington Northern appears to have no lines within the Western District of Pennsylvania, although it does maintain an office in Pittsburgh where service of process was made.

There is little law on the application of the clause of 20(11) restricting the venue of actions against delivering carriers. However, *K. Shapiro, Inc. v. New York Central Railroad Co.*, 152 F.Supp. 722 [E.D.Mich. 1957], held that that restriction does not bar an action against a delivering carrier where an independent jurisdictional basis lies. *Shapiro* relied on the saving language in 20(11) that:

"* * * nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under the existing law."

*W. D. Lawson & Co. v. Penn Central Company*, 456 F.2d 419 [6th Cir. 1972] would lead to a contrary result. *Lawson* held that the Carmack Amendment pre-empted state law, and that a Tennessee statute providing for substituted service of process on statutorily designated agents could therefore not be used to serve the non-resident defendant corporation, which was a delivering carrier. *Lawson* itself recognized the practical identity of the common law and Carmack Amendment counts, and the real thrust of its decision was that Congress's statutory scheme which prohibited the bringing of certain suits against the delivering carrier pre-empted state law and should not have been avoided by application of an inconsistent state statute. If *Lawson* is applicable to the present suit, we do not think it sound, and we note that the Supreme Court decision on which it heavily relies, *Adams Express Co. v. Croninger*, 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314 [1913], did not hold that the Carmack Amendment abolished common law rights completely, but rather

"only intended to continue in existence such other rights or remedies for the redress of some specific wrong or injury, whether given by the Interstate Commerce Act, or by state statute, or common law, *not inconsistent* with the rules and regulations prescribed by the provisions of this act." (Emphasis added). *Adams v. Croninger*, supra, quoting from *Texas & Pacific Ry. Co. v. Abilene Cotton*

*Oil Co.*, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553

The question of where a delivering carrier could be sued was the subject of considerable debate when the House considered the 1927 Amendment that extended the Carmack Amendment to delivering carriers. Representative Newton of Minnesota, author of the House Committee on Interstate and Foreign Commerce report on S. 3286, stated the following in presenting the bill to the House.[1]

"The Carmack amendment in no wise affected the liability of the connecting or delivering carrier for loss or damage occurring on its own line. The remedy provided by the Carmack amendment was in addition to the remedies then available to the shipper or owner of the goods. However, generally speaking, information as to the carrier causing the loss or damage is available only to the carrier. As a practical proposition, the owner must sue the initial carrier. In most cases the consignee is the owner. In suing the initial carrier he must bring suit where that carrier is operating a line of railroad or otherwise doing business so as to permit service of process. In most cases this is outside the state of the party plaintiff or consignee. This means additional expense to the commencing and prosecution of the suit, especially as to witnesses. Oftentimes some carriers take advantage of this fact and either refuse or delay settlement of the claim. The committee therefore felt that the shipper should also have the right to proceed against the delivering carrier to the same extent that he now has to proceed against the initial carrier.

MR. CHINDBLOM. It gives an optional remedy?

MR. NEWTON of Minnesota. Yes. In view of this change the committee thought it but fair to include a provision providing that the commencement of actions against the delivering carrier should be brought in a State where that carrier was operating a line of railway, so that the carrier could not be forced to stand suit at some point far away from where its witnesses would be available. Hence the occasion for the second amendment in this section. The fourth amendment defines a delivering carrier so as to exclude the carrier performing a mere switching service at point of destination." 67 *Cong. Record* 12575 (1926, 69th Cong. 1st Sess.)

Representative Huddleston of Alabama criticized the bill insofar as it limited the right to sue the delivering carrier to a state or district in which it operates a line of railroad. His criticism particularly went to cases where cities border neighboring states and the actual delivery was made across state lines by a switching operation, in which case the receiving consignee could not bring suit in its own state but must proceed in the neighboring state. In Huddleston's words the amendment he offered, which was not approved:

" * * * eliminates the objectionable conditions under which we confer the right of suit again a delivering carrier. I hold that, as a matter of principle, where the delivering carrier is liable as this bill makes it liable, the carrier ought to be subject to be sued in any court which is proper for the assertion of the right of the plaintiff. In other words, we ought not to say that the carrier shall be liable for a certain damage but the plaintiff shall assert his rights in certain courts suited to the convenience of the carrier. We are laying down the principle here that a certain state of facts creates a liability. If it is a just and proper liability, we should allow parties who are asserting rights under it to resort to such courts as they would resort to to assert their rights under different liabilities." 67 Cong.Rec. 12763 [1926, 69th Cong., 1st Sess.].

▮ The debate between Huddleston and Newton may suggest a strict limitation on the right to sue the delivering carrier.

---

1. The debate was over H. R. 12065, the House version of Senate Bill S. 3286. In pertinent part, the bills were the same, See 68 Cong. Rec. 5651 (69th Cong. 2nd Sess. 1927).

Properly understood, however, the legislative history leads to the result of the *Shapiro* case, supra, that a delivering carrier is still subject to suit where an independent jurisdictional base lies. As originally enacted, the Carmack Amendment did not affect the liability of the connecting or delivering carriers for loss or damage occurring on their own lines, but added an additional remedy against initial carriers. The 1927 amendment was intended to create an even further remedy for shippers, the right to sue the delivering carrier for the entire loss, provided only that the suit be brought in a district in which the delivering carrier operates a line. The very most the limitation on suits against delivering carriers should be taken to mean is that if liability is sought against the delivering carrier for the entire loss under 20(11), regardless of which line the loss occurred on, the suit must be brought in a district in which the carrier has track, but as for recovering the losses that occurred on the delivering carrier's own lines, suit may be brought wherever proper service can be had. Nothing in the Committee Reports suggests a contrary result. See House Reports No. 1214, 69th Cong., 1st Session, and No. 2882, 69th Cong., 2nd Sess., and Senate Report No. 1508, 69th Cong., 2nd Sess.

■ In the present case, Merchant Shippers has joined Burlington Northern as a third-party defendant, alleging generally that any damage to the goods is Burlington Northern's fault, and not Merchant Shippers. As it is not required in third-party practice, no allegations of diversity of citizenship are made, nor for that matter is a claim made against Burlington Northern solely as a result of its status as a delivering carrier. Likewise, Burlington Northern's answer to the Third-Party Complaint does not raise improper venue as an affirmative defense. Under the present state of the pleadings and the well-reasoned *Shapiro* case, we are not inclined to dismiss Burlington Northern on this basis. We need not in any event determine with finality the full extent of Burlington Northern's liability, as there is a possibility of recovery against Burlington Northern on a common law basis for damage actually occurring on its line, and dismissal of Burlington Northern would therefore be improvident.

*Chicago & N. W. Ry. v. Whitnack Co.*, 258 U.S. 369, 42 S.Ct. 328, 66 L.Ed. 665 [1921] recognized that the Carmack Amendment did not destroy the old common law presumption that the injury occurred on the delivering carrier's line when the goods moving in interstate commerce upon a through bill of lading are delivered in bad condition and the evidence shows they were sound when received by the initial carrier but does not affirmatively establish where the loss occurred. This presumption is not changed by *Blue Bird,* supra, which held that when the shipper delivers goods under seal, their good condition is not established merely by a notation of "apparent good order" on the bill of lading.

■ Thus, if delivery of the goods in good condition to the initial carrier can be shown, and if the fault does not lie in defective packing by the shipper, Burlington Northern might be held liable on this theory, either to the freight-forwarder Merchant Shippers or to some other carrier. As to its liability to other carriers, Burlington contends that an initial carrier must prove "that the negligence of the connecting carrier proximately caused the loss complained of", citing *Briggs Transfer Co. v. Chicago Great Western Railway Co.*, 11 Fed.Car. Cases ¶ 18,071 [N.D.Ill.1956], and contends further that Section 20(12) requires affirmative proof that the damage occurred on a particular carrier's track, citing *Aetna Insurance Co. v. Newton,* 456 F.2d 655 [3d Cir. 1972]. We fail to see any support for Burlington's position in *Aetna,* and *Briggs* is simply a case in which the plaintiff failed to adequately brace the load and the defendant carrier was not shown to be at fault. *Briggs* is scant authority for overriding the Supreme Court decision in *Whitnack.* While we do not foreclose further inquiry as to the applicable law in this area at trial, we think it imprudent to dismiss Burlington at this point in time since it has not satisfactorily shown *Whitnack* to be inapplicable.

We observe at this time, too, that in the event that Burlington could be sued in this district for Carmack Amendment liability as a delivering carrier, as well as in common law negligence, the *Blue Bird* doctrine would be of no help to it. The problems of proof imposed on Merchant Shippers is the very reason for the Carmack Amendment. While the common law duty placed on a carrier is much like that of an insurer, where the goods change hands several times the shipper is often at a loss to show where in the course of transit the damage occurred. In the case of a suit against a delivering carrier under Carmack, proper proof of delivery in good condition to the *initial* carrier, and delivery in damaged condition, is all that is required. To hold otherwise would nullify the provision making the delivering carrier responsible, like the initial carrier, for the entire loss, as it would force the consignee to trace the damage and show that it could have occurred only on the line of the delivering carrier.

We will, therefore, deny Burlington Northern's motion for summary judgment on the cross-claim of Breman's and vacate our previous order granting Burlington Northern summary judgment over Merchant Shippers.

## III.

When we previously entered judgment in favor of Alaska Railroad over Third-Party Plaintiff Merchant Shippers, we determined:

(1) There was no evidence that any damage occurred on Alaska Railroad's own line. On the contrary the evidence clearly showed that the goods were substantially damaged when examined in Seattle.

(2) The Carmack Amendment, 49 U.S. C.A. § 20(11), did not apply because the act of unloading the shipment from trailers into boxcars in Seattle broke the continuous shipment under a bill of lading and created a new shipment originating in Seattle.

(3) Under the evidence produced by Alaska Railroad it is impossible for Merchant Shippers to show how much damage, if any, occurred between Seattle and Fairbanks.

(4) The Alaska Railroad Company is not subject to the Interstate Commerce Act, and particularly, to the Carmack Amendment.

No additional evidence has been presented that would change these conclusions. Nor in any event is there any possibility of recovery between Breman's and Alaska Railroad, since we have determined that Breman's will in no event be liable beyond the break in shipment at Seattle. Similarly, Alaska Railroad cannot be liable for any damages occurring prior to the break in transportation in Seattle. The cross-claim between Breman's and Alaska Railroad can therefore be dismissed.

However, our re-examination of the record in this case causes us to question whether Alaska Railroad should be dismissed as to any common law claims for damages against it. It seems to be without doubt that some additional damage occurred during the trip between Seattle and Fairbanks, Alaska. Under our reasoning above as to the other carriers, Alaska Railroad might be proven liable for this damage even though it received the shipment under seal.

In our previous opinion we considered this additional damage to be irrelevant. Mainly, this was because of the deposition of W. D. Archer, Merchant Shippers' man who inspected the load when it was repacked in Seattle. At the time he considered certain "rubbing" marks to be minor and therefore did not completely itemize the extent of such damage in his report, although he did itemize "major" damage. Later, when he was informed that these rub marks were on an anodized surface, he changed his opinion and concluded that this damage was major. It therefore appeared that there was no way to ascertain the amount of additional damage that occurred between Seattle and Fairbanks. We think, nevertheless, that Archer's inspection reports, coupled with the subjective reactions of those who saw the shipment either in Seattle or Fairbanks, and additional facts

such as the method of packing, the amount of broken glass, and the general order or disarray of the shipment when opened, are sufficient to let a trier of fact decide the extent of damage at Seattle. Further, the parties may have evidence showing to what extent small rub marks affect the salvage value (can they be repaired or painted over at all, and if not how much does it affect the useful life of the window?) Finally, a jury might draw some inferences from the simple fact that the shipment was continued from Seattle (if it was a total loss, would not someone have stopped the shipment at Seattle and notified Season-All?) In sum, we think that this is a matter for the trier of fact, and that our previous entry of summary judgment in favor of Alaska Railroad was improvident.

We, therefore, vacate our earlier entries of summary judgment and modify our previous opinion insofar as it is inconsistent with the present.