## National Fuel Gas Distribution Corp. v. Amstead Industries, Inc.

*Robert W. Parker*, for plaintiff.
*Michael Visnosky, William J. Schaaf*, and *John G. Gent*, for defendants.

CARNEY, *P.J.*, July 1, 1980—This action is before the court on the motion for summary judgment of Penn Central Transportation Company and its trustees (hereinafter Penn Central) and the Youngstown and Southern Railway Company. National Fuel Gas Distribution Corporation (hereinafter NFG) seeks recovery for damages to a large shipment of pipe from North Lima, Ohio, to Kane, Pennsylvania, in July 1972. The pipe was shipped via the Youngstown and Southern and Penn Central.

NFG's fourth amended complaint sets forth seven counts of which five are against the railroads. Count III of the complaint is in assumpsit for breach of an express and implied contract for carriage. Count IV is in trespass for negligently loading and transporting the pipe. Count V is in assumpsit and is based upon the Interstate Commerce Act, specifically the so-called Carmack Amendment of June 29, 1906, 34 Stat. 595, 49 U.S.C.A. §20, par. (11).[1] Counts VI and VII are in

1. Since commencement of this action the Carmack Amendment has been absorbed in various sections of the Revised Interstate Commerce Act of October 17, 1978, 92 Stat. 1337, 49 U.S.C.A. §10101 et seq, and specifically §§10103, 10730 and 11707. As enacted at the time this action was commenced, the amendment provided in part:

"Any common carrier, railroad, or transportation company subject to the provisions of this chapter receiving property for transporation from a point in one State or Territory or the District of Columbia to a point in another State, Territory, District of Columbia, or from any point in the United States to a point in an adjacent foreign country shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States on within an adjacent foreign country when transported on a through bill of lading, and no contract, receipt, rule, regulation, or other limitation of any character whatsoever shall exempt such common carrier, railroad, or transportation company from the liability imposed; and any such common carrier, railroad, or transportation company so receiving property for transportation . . . or any common carrier, railroad or transportation company delivering said property so received and transported shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage, or injury to such property caused by it or any such common carrier, railroad, or transportation company to which such property may be delivered or over

trespass. Because the railroads' motion for summary judgment is premised solely upon the alleged running of the period of limitations contained in the

whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission; and any such limitation, without respect to the manner or form in which it is sought to be made is declared to be unlawful and void. . . . Provided, however, That the provisions hereof respecting liability for full actual loss, damage or injury, notwithstanding any limitation of liability or recovery or representation or agreement or release as to value, and declaring any such limitation to be unlawful and void, shall not apply . . . to property . . . received for transportation concerning which the carrier shall have been or shall be expressly authorized or required by order of the Interstate Commerce Commission to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding the value so declared or released, and shall not, so far as relates to values, be held to be a violation of section 10. . . . Provided further, That nothing in this section shall deprive any holder of such of a receipt or bill of lading any remedy or right of action which he has under the existing law. . . . Provided further, That it shall be unlawful for any such receiving or delivering common carrier to provide by rule, contract, regulation, or otherwise a shorter period for the filing of claims than nine months, and for the institution of suits than two years, such period for institution of suits to be computed from the day when notice in writing is given by the carrier to the claimant that the carrier has disallowed the claim or any part or parts thereof specified in the notice: And provided further, That for the purposes of this paragraph and of paragraph (12) of this section the delivering carrier shall be construed to be the carrier performing the line-haul service nearest to the point of destination and not a carrier performing merely a switching service at the point of destination. . . ."

uniform bill of lading issued pursuant to the Carmack Amendment, the threshold question presented is whether Counts III, IV, VI and VII are also time-barred by the period of limitation in the uniform bill of lading.[2] On this issue we conclude (1) that the Carmack Amendment itself does not constitute a period of limitation but merely authorizes the shipper and the carrier to negotiate a period of limitation which cannot be less than two years, and (2) that the Carmack Amendment has not preempted state common law causes of action against a carrier and thus any period of limitation negotiated under a bill of lading is inapplicable to bar a state common law cause of action.

Our first conclusion on this issue is firmly established. See Louisiana & W. R. Co. v. Gardiner, 273 U.S. 280, 47 S.Ct. 386 (1927); Cordingley v. Allied Van Lines, Inc., 563 F. 2d 960, 963 (9th Cir. 1977).

With regard to our second conclusion we are aware of several Federal decisions, including those of the United States Supreme Court, which imply that the Carmack Amendment preempted state common law causes of action. See Missouri Pacific R. Co. v. Elmore & Stahl, 377 U.S. 134, 84 S.Ct. 1142 (1964); Missouri Pacific R. Co. v. Porter, 273 U.S. 341, 47 S.Ct. 383 (1927); Missouri, Kansas & Texas Rwy. v. Harriman, 227 U.S. 657, 33 S.Ct. 397 (1913); Adams Express Co. v. Croninger, 226 U.S.

---

2. NFG asserts in its supplemental brief that it never received the uniform bill of lading or that if it did, it can't find the bill. Moreover, the railroads have been unable to produce it. We do not think this absence is crucial. First, both the original Carmack Amendment and the Revised Act provide for liability whether the required bill has been issued or not. Secondly, NFG took the peculiar step of incorporating by reference a bill of lading it didn't know whether it had.

491, 33 S.Ct. 148 (1913); W. D. Lawson & Co. v. Penn Central Co., 456 F. 2d 419 (6th Cir. 1972); American Synthetic Rubber Corp. v. Louisville & Nashville R. Co., 422 F. 2d 462 (6th Cir. 1970); Fulton v. Chicago, Rock Island & Pac. R. Co., 481 F. 2d 326 (8th Cir. 1973). These latter three opinions of the courts of appeal are premised upon language contained in the aforecited Supreme Court decisions.

We read these decisions of the Supreme Court more narrowly and do not believe either the language of the amendment or its purpose support the conclusions that state common law causes of action have been preempted. In Adams Express, supra, the Supreme Court held that a stipulation in a bill of lading limiting the carrier's liability to a declared value in exchange for a lower carriage rate did not violate the proviso of the Carmack Amendment against contracts or receipts exempting a carrier from liability. Although Adams Express involved an interstate shipment through Kentucky which was never delivered, the shipper argued that the Carmack Amendment did not preclude Kentucky from prohibiting limitations of value by statute. In discussing this contention the court stated:

"But it has been argued that the non-exclusive character of this regulation is manifested by the proviso of the section, and that state legislation upon the same subject is not superseded, and that the holder of any such bill of lading may resort to any right of action against such a carrier conferred by existing state law. This view is untenable. It would result in the nullification of the regulation of a national subject and operate to maintain the confusion of the diverse regulation which it was the purpose of Congress to put an end to.

"What this court said of §22 of this act of 1906 in the case of Texas & Pac. Ry. v. Abiline Cotton Mills, 204 U.S. 426, 51 L.Ed. 553, [27 Sup. Ct. Rep. 350, 9 Sup. Ct. Rep. 1075], is applicable to this contention. It was claimed that that section continued in force all rights and remedies under the common law or other statutes. But this court said of that contention what must be said of the proviso in §20, that it was 'evidently only intended to continue in existence such other rights or remedies for the redress of some specific wrong or injury, whether given by the Interstate Commerce Act, or by state statute, or common law, not inconsistent with the rules and regulations prescribed by the provisions of this act.' Again, it was said, of the same clause, in the same case, that it could 'not in reason be construed as continuing in a shipper a common law right the existence of which would be inconsistent with the provisions of the act. In other words, the act cannot be said to destroy itself.'

"To continue this proviso as preserving to the holder of any such bill of lading any right or remedy which he may have had under existing Federal law at the time of his action, gives to it a more rational interpretation than one which would preserve rights and remedies under existing state laws, for the latter view would cause the proviso to destroy the act itself. One illustration would be a right to a remedy against a succeeding carrier, in preference to proceeding against the primary carrier, for a loss or damage incurred upon the line of the former. The liability of such succeeding carrier in the route would be that imposed by this statute, and for which the first carrier might have been liable." 226 U.S. 507-508, 57 L.Ed. 320-321.

The same year in Missouri, K. & T. Rwy. Co. v. Harriman, supra, the court considered whether

Missouri or Texas by statute could invalidate a stipulation in a bill of lading that suit be brought within 90 days of the loss. The court held at 672:

"The validity of any stipulation in such a contract which involves the construction of the statute, and the validity of a limitation upon the liability thereby imposed is a Federal question to be determined under the general common law, and, as such, is withdrawn from the field of state law or legislation."

In Missouri Pac. R. Co. v. Porter, supra, the court held that a stipulation in an interstate bill of lading exempting the carrier from liability caused by fire was valid under the Interstate Commerce Act and could not be defeated by a contrary Arkansas statute. Finally, in Missouri Pac. R. Co. v. Elmore & Stahl, supra, the court merely stated: "The parties agree that the liability of a carrier for damage to an interstate shipment is a matter of federal law controlled by federal statutes and decisions." Ibid., at 137, 84 S.Ct. at 1144.

It is apparent that in none of the above Supreme Court decisions was the question of preemption of a state common law cause of action squarely presented and decided. The language of the Carmack Amendment expressly preserves "any remedy or right of action which he has under the existing law." As discussed in Adams Express, this includes rights not inconsistent with the amendment.[3] Moreover, the purpose of the amendment was to allow a legal holder of a bill of lading for an interstate shipment to recover from the initial carrier

---

3. This proviso of the amendment has been retained in the Revised Interstate Commerce Act, 49 U.S.C.A. §10103. Presumably Congress retained this proviso cognizant of the decision in Adams Express and its progeny.

for damage to goods whether the damages occurred while in that carrier's hands or those of a connecting carrier. At common law prior to the amendment, a carrier was liable for damages except those caused by an act of God, a public enemy, the shipper himself, public authority or the inherent nature of the goods. Thus, at common law a shipper need not prove negligence to recover. Moreover, even as to the excepted causes, a carrier was liable if he was negligent in failing to protect against them. Thus, the Carmack Amendment removed the one difficult burden a shipper faced in a common law suit—pinpointing in which carrier's possession the goods were at the time of loss. See Missouri Pac. R. Co. v. Elmore & Stahl, supra; Litvak Meat Co. v. Baker, 446 F. 2d 329 (10th Cir. 1971); L. E. Whitlock Truck Service, Inc. v. Regal Drilling Co., 333 F. 2d 488 (10th Cir. 1964). We find nothing in the language of the amendment or its purpose that precludes a shipper from recovering at common law if he can carry his burden of demonstrating which carrier caused the loss. See also Season-All Industries v. Merchant Shippers, 451 F. Supp. 727 (W. D. Pa. 1978); Peter Kiewit Sons' Co. v. Colorado & Southern Rwy. Co., 199 F. Supp. 261 (D. Colo. 1961). Our conclusion is that Counts III, IV, VI and VII are not time-barred by virtue of the Carmack Amendment. We turn our attention to Count V.

It is, of course, true that summary judgment can be granted only where there is no genuine issue of material fact: Amabile v. Auto Kleen Car Wash, 249 Pa. Superior Ct. 240, 376 A. 2d 247 (1977). In reaching this determination the record must be viewed in the light most favorable to the non-moving party. Ibid. However, in the present case resolution of the motion turns upon the interpreta-

tion of a series of letters the authenticity of which is admitted and which create no issue of credibility. Absent an ambiguity the interpretation of these writings is a question of law for the court: Parnell v. Saltsburg Joint School Board, 192 Pa. Superior Ct. 94, 160 A. 2d 247 (1960); Trans-Fuel, Inc. v. Saylor, 440 Pa. 51, 269 A. 2d 718 (1970). See also Book Metals Corp. v. Sitkin Smelting & Refining, Inc., 254 Pa. Superior Ct. 21, 385 A. 2d 504 (1978).

Although the parties have not been able to produce the uniform bill of lading issued for the shipments in dispute, they have provided the court with a like uniform bill which provides in section 2(b) that:

"Suits shall be instituted against any carrier only within two years and one day from the day when notice in writing given by the carrier to the claimant that the carrier has disallowed the claim or any part or parts thereof specified in the notice. Where claims are not filed or suits are not instituted therein in accordance with the foregoing provisions, no carrier hereunder shall be liable, and such claims will not be paid."

Obviously, the issue raised by the railroads' motion as to whether NFG's Carmack claim is time-barred is dependent upon when NFG was provided with notice of disallowance sufficient to satisfy section 20, par. (11).

The correspondence accompanying NFG's affidavit in opposition to the motion for summary judgment consists of 22 documents. Those relevant to this motion include plaintiff's Exhibit 1, a letter from NFG's D. W. Morse, dated February 14, 1973, which sets forth NFG's claim for $39,759.32. On February 26, 1973, Penn Central's Manager of

Freight Claims, H. W. Jones, replied to NFG, requesting additional information and indicating NFG's claim had not been "entered into our system." Jones' letter gave assurances that the claim when resubmitted would not be in violation of the limitation period. Plaintiff's Exhibit 2. After exchanging several requests for information, Penn Central's Assistant Manager of Freight Claims, N. R. Berner, wrote Mr. Morse on May 8, 1973. This letter in part stated:

"Our investigation reveals that we have no record at destination of being notified of damage claimed. . . .

"Under the circumstances, claims for damages in these cars is disallowed.

"Kindly amend your claim accordingly with an itemized statement showing how your amendment is arrived at.

"Upon receipt of above, claim will be given prompt handling." Plaintiff's Exhibit 6.

Thereafter, Mr. Morse wrote two letters to Mr. Berner requesting early attention to the claim and an updating of the file. Plaintiff's Exhibits 7 and 8. On August 28, 1973 Mr. Jones responded to NFG (at the time, Pennsylvania Gas Company) indicating that the claim was "under active handling, and we hope to conclude as quickly as possible." Plaintiff's Exhibit 9. Approximately one week later on September 5, 1973, Mr. Berner again wrote to Mr. Morse. Referring to the claim, he wrote, "Therefore, we have no alternative but to maintain our disallowance as outlined in our letter of May 8, 1973, copy attached." Plaintiff's Exhibit 10.

NFG then turned over the claim to its counsel who wrote to Mr. Berner on September 6, 1973. This letter referred to Penn Central's recalcitrant

attitude, but requested their current position in order to avoid taking any unnecessary steps. Plaintiff's Exhibit 11. NFG's counsel again wrote to Mr. Berner on October 12, 1973, stating that "your disallowance is not justified." Plaintiff's Exhibit 12. On December 7, 1975 Mr. Berner replied to NFG's counsel. This letter stated:

"After a considered review of the facts and details involved together with the data we have, I find we are unable to make any offer at this point because we do not have enough facts."

After requesting additional information, the letter concluded:

"This information will help us to further evaluate the facts to properly conclude this matter. . . . " Plaintiff's Exhibit 13.

As a follow-up to this letter, NFG's counsel wrote Mr. Berner on February 8, 1972, providing additional information and requesting an immediate settlement. Plaintiff's Exhibit 14. Apparently this letter was delayed in the mails because on February 19, 1974 Mr. Jones wrote to NFG's counsel indicating that Penn Central had not received a reply to their December 9, 1973 letter; therefore, the claim was disallowed. Plaintiff's Exhibit 15. After receiving NFG's letter of February 8, 1974, Mr. Berner replied on March 11, 1974 requesting still further information and indicating that "clarification . . . should allow a prompt conclusion of this claim in accordance with the carrier's legal liability." Plaintiff's Exhibit 16. Once again on June 30, 1974, having not received a reply to their March 11, 1974 letter, Penn Central's Jones again wrote to NFG's counsel advising them that without the requested information the claim could not be han-

dled; thus, the claim was disallowed. Plaintiff's Exhibit 17. Almost a year later on May 11, 1975 NFG responded to Penn Central's letter of March 11, 1974. Plaintiff's Exhibit 18. On July 18, 1975 Mr. Jones replied. The letter referred to section 2(b) of the bill of lading and Penn Central's letter of May 8, 1973, disallowing the claim. A nominal settlement was then offered. Plaintiff's Exhibit 19.[4] Suit was not instituted until October 17, 1977.

"To be effective a notice of disallowance must clearly convey to the claimant the message that his claim has been rejected." Cordingley v. Allied Van Lines, supra, at p. 964. The notice of disallowance must be "clear, final and unequivocal" in order to trigger the bill of lading's period of limitation. Ibid. Polaroid Corp. v. Herman Forwarding Co., 541 F. 2d 1007 (3d Cir. 1976); Cumberland Bldgs. Co., Inc. v. Blanchette, 261 Pa. Superior Ct. 31, 395 A. 2d 572 (1978). Moreover, whether the disallowance is legally correct is irrelevant to the issue of whether a claim is time-barred. Ibid. John Morrell & Co. v. Chicago, Rock Island & Pac. R. R. Co., 495 F. 2d 331 (7th Cir. 1974). Our Superior Court has also embraced those cases holding that subsequent correspondence or negotiations between the parties cannot toll the period of limitation once a legally effective disallowance has been tendered: Cumberland Bldgs., supra, at 38, 395 A. 2d at 576, and cases therein cited. Finally, a legally effective disallowance of part of the claim will bar the entire claim: Polaroid Corp., supra, at 1011, and cases therein cited.

---

4. We have set forth in detail the substance of these letters because we do not believe they create an ambiguity.

As understandable as these principles might be, courts have not always adopted a uniform approach in determining when an effective disallowance has been made. In Cordingley, the circuit court adopted the trial court's "totality of the conduct" test to determine when an effective disallowance occurred. This test sanctions an inquiry into the carrier's intention as revealed by his written communications. In Cordingley, the court examined three letters, the first of which denied the carrier's liability. After receiving a reply letter from the claimant, Allied promised further consideration of the claim and a response in the near future. The circuit court held that when viewed with the other related correspondence, the initial letter denying liability did not reflect the carrier's intention to finally disallow the claim.

In John Morrell & Co. v. Chicago, Rock Island & Pac. R. R. Co., supra, the court refused to view the carrier's initial letter disallowing the claim as a clear denial because the disallowance was based upon inadequate loading. Because this letter reasonably left the door open for negotiations, resort to subsequent correspondence for clarification was necessary.

In Polaroid, supra, the carriers' insurer and Polaroid engaged in correspondence over whether Polaroid should be paid the manufacturer's cost or the dealer's invoice. On October 19, 1970 the insurer, relying upon the manufacturer's cost as the proper measure of the claim, offered to settle the claim at a specific figure and sent Polaroid a general release. On February 9, 1971 the insurer, having not received the executed release, wrote Polaroid insisting that it was not paying more than

the manufacturer's cost and requesting a meeting to possibly work out settlements. Thereafter, other letters followed and on May 19, 1972 the insurer wrote Polaroid advising them that the October 19, 1970 letter was a disallowance and that the period of limitation was running. The circuit court held that the insurer's letters of April 9, 1970, October 19, 1970, and February 9, 1971 constituted adequate notice of disallowance of the claim.

Weighing most heavily on this court is the decision in Cumberland Bldgs. Co., supra. The carrier disallowed the claim on January 21, 1972 because it believed the damage was attributable to improper packaging. Although Cumberland requested the carrier to review the facts with its inspector, on February 3, 1972 the carrier reaffirmed its prior position. After receiving an inquiry from Cumberland's counsel as to their final position, the carrier wrote on November 6, 1972 that it had seriously reviewed the facts, but still denied liability and reiterated its previous declination. The Superior Court held that the carrier's letter of January 21, 1972 constituted a final and unequivocal disallowance. The court rejected the notion that the carrier's letter of November 6, 1972 evidenced a reconsideration of the claim, reasoning that the carrier had already declined a claim a second time on February 3, 1972 after being asked to consult its inspector. Further, the court concluded that the November 6 letter could not reflect a reconsideration because of the case law holding that subsequent correspondence does not toll the period of limitation.

Viewing the facts of this case in light of the above principles and specific decisions, we need not decide whether Penn Central's letter of May 8, 1973 (Plaintiff's Exhibit 6) constituted a clear, final, and

unequivocal disallowance of NFG's claim. We hold that Penn Central's letter of September 5, 1973 constituted a clear and final disallowance of NFG's claim. Plaintiff's Exhibit 10. This letter clearly reflected Penn Central's intent to rely upon its prior disallowance of May 8, 1973. Moreover, this disallowance came after NFG's letter of May 14, 1973, asking Penn Central to check with Mr. Mount who allegedly inspected the shipment upon its arrival in Kane. In addition, NFG's counsel understood that Penn Central was disallowing the claim because his letter of October 12, 1973 stated that the disallowance was not justified. Plaintiff's Exhibit 12. Thereafter, Penn Central repeated its disallowance in its letters of February 19, 1974 and June 30, 1974. Plaintiff's Exhibits 15 and 17. We do not deny that during the period from February 1974 to July 1974 the parties discussed requests for additional information that might produce a settlement consistent with Penn Central's legal liability. However, Penn Central had already taken the position that it had no legal liability for damages involving 34 of the 42 cars shipped. Plaintiff's Exhibits 6 and 10. Moreover, as noted in Cumberland Bldgs., supra, these subsequent communications and negotiations do not toll the period of limitations. See also B. F. Goodrich Tire Co. v. Louisville & Nashville R. Co., 439 F. Supp. 363 (S.D.N.Y. 1977).

For the above reasons we shall grant defendants' motion for summary judgment and dismiss Count V of the complaint.

## ORDER

And now, July 1, 1980, for the reasons set forth above, the motion for summary judgment of the

Youngstown and Southern Railway, the Penn Central Transportation Company and the Trustees of the Penn Central Transportation Company is granted as to Count V alone of the fourth amended complaint and said Count V is hereby dismissed.