**THOUSAND SPRINGS TROUT FARMS, INC., a corporation, Appellee,**

v.

**IML FREIGHT, INC., a corporation, Appellant.**

No. 75–1414.

United States Court of Appeals, Ninth Circuit.

July 29, 1977.

William S. Richards, Gary A. Frank, argued, Richards & Richards, Salt Lake City, Utah, for appellant.

Elam, Burke, Jeppesen, Evans & Boyd, Gardner W. Skinner, Jr., argued, Eberle, Berlin, Kading, Turnbow & Gillespie, Boise, Idaho, for appellee.

Before ELY and WALLACE, Circuit Judges, and BYRNE, District Judge.*

* Honorable William Matthew Byrne, Jr., United States District Judge, Los Angeles, California, sitting by designation.

ELY, Circuit Judge:

In this "diversity" action brought by a shipper (Thousand Springs) against a carrier (IML) for damage to a load of fresh trout, we attempt to apply well-settled principles of generally applicable law to an unusual fact situation involving perishable goods.

## I.

Thousand Springs operates a trout farm and packing plant near Buhl, Idaho, and IML Freight is an interstate motor carrier of freight for hire with terminals in a number of cities, including Twin Falls, Idaho.[1] In early September, 1972, Kroger Company entered into an oral contract with Thousand Springs. It was agreed that Kroger would purchase 24,450 pounds of fresh trout from Thousand Springs. For the fish, Kroger agreed to pay 84 cents per pound, a total of $20,538. Thousand Springs arranged with IML that a "reefer" (a trailer with refrigeration capabilities) be delivered to the facility of Thousand Springs on the morning of October 5th. Additionally, it was agreed that the fish should be loaded, the trailer and cargo to be picked up by noon, October 6th, and that delivery to Kroger in Columbus, Ohio should be made on or before October 9th.

On October 5th, at approximately 10 a. m., IML delivered a trailer equipped with a liquid nitrogen cooling system to the Thousand Springs plant. Under the terms of the agreement between the parties, a "shipper's load and count" agreement, Thousand Springs' employees were responsible for the loading of the fish onto the trailer; however, none of these employees had experience with a liquid nitrogen truck. One Roske, IML's terminal manager, was called and asked to furnish a mechanical refrigeration unit with which Thousand Springs' people were familiar, but he reported that there was no mechanical unit available and that the nitrogen unit would maintain refrigeration at 33°[2] at all times during transit.

Thousand Springs employees were told not to expect any noise from the unit, inasmuch as cooling was effected by liquid nitrogen droplets which vaporized when fed into the interior of the trailer. Both Roske and the IML driver instructed Thousand Springs personnel in respect to the operation of the nitrogen unit. Before noon on October 5th, Thousand Springs' shipping foreman activated the cooling unit for the purpose of pre-cooling before loading. Unknown to the foreman, however, was the fact that the nitrogen tank was empty. At a later time Roske maintained that he thought the tank was 20% full when it was sent to the plant, but the driver for IML testified that he tested the valve before delivering the trailer and it would not work, indicating to him that the tank was empty. The driver advised no person at Thousand Springs that the nitrogen tank was empty.

Since Thousand Springs' refrigeration facilities could only accommodate 9000 pounds of trout at one time, the loading operation was carried on in stages, 3000 pounds loaded during each stage. The trailer doors remained open during most of the loading process.

On October 6th, at about 1:30 a. m., Thousand Springs' employees became concerned when it appeared that the fish were not being refrigerated. They decided to load no additional fish that morning, and dry ice was placed in the trailer in an attempt to cool the 9000 pounds of trout that had already been loaded. At 8:30 a. m., Mr. Erkins, the president of Thousand Springs, called Roske to tell the latter that the refrigeration unit was not properly functioning and was apparently without the necessary liquid nitrogen. Roske acknowledged that he understood the problem and that he also understood that Thousand Springs intended to hold IML liable for the value of the fish if the load did not reach Columbus in marketable condition. Roske

---

1. The statement of facts is taken from the unpublished memorandum of the District Court.

2. The various degrees of temperature maintained herein are on the Fahrenheit scale—not Celsius.

explained to Erkins that since liquid nitrogen could not be transported to the Thousand Springs plant from Burley, Idaho, the nearest location where the refrigerant was available, it would be necessary, in order to fill the tank, to take the transporting unit to Burley. Following this conversation, the loading of the trout continued. During the loading Thousand Springs' quality control biologist monitored the temperature of the fish that had been placed in the trailer during the night.[3] Although the temperature of the fish was 38° when the fish were placed in the trailer, by the morning of October 6th their temperature had risen to a range from 47° to 56°. At 2:00 p. m. that afternoon, IML's driver, knowing that the trailer was loaded with fresh fish to be delivered to Columbus, Ohio, that a portion of the load had been in the trailer overnight, and that Thousand Springs was concerned by the rising temperature of the fish, accepted the load for transportation to Columbus.

The Bill of Lading, issued by Thousand Springs and accepted by IML, provided that a temperature of 33° should be maintained at all times during shipment. One Wold, a quality control biologist, accompanied the load to Burley, where, at 5:00 p. m. a full tank of nitrogen was used in an effort to cool the fish. This caused the temperature of the trout to drop to between 44° and 52°. Additional nitrogen was added and by 7:00 p. m. the temperature of the fish ranged from 38° to 51°. Wold, hopeful that the temperature of the trout would continue to lower, was assured that the thermostat on the trailer would be reduced to 28° for the trip. Both Wold and the IML driver were unaware that a liquid nitrogen unit cannot effectively lower the temperature of a product to any substantial degree but is only effective in maintaining the existing temperature of a particular load.

The load was delivered to Kroger at 1:30 p. m. on October 9th, and Kroger employees examined several bags of the fish in the back of the trailer. While the fish appeared to be in a fit condition, the temperature of these samples was 42°. Worried over the high temperature reading, Mr. Callahan, a meat merchandiser for Kroger, called Thousand Springs and was told by Erkins that the fish might still be in good condition but that they should be refrigerated at once. The trout were then placed into cooling rooms and blast freezers which maintained a temperature of 34 degrees. Early on October 10th, half the fish were distributed to 63 Kroger retail food stores and shortly thereafter, Kroger received complaints from a number of stores that the fish were spoiled. On checking 7 to 10 boxes of fish that remained in the blast freezers, Kroger's employees discovered that over half the fish in each box had definite visible signs of decomposition.

Sometime prior to noon on October 10th, Kroger called Erkins of Thousand Springs and revoked Kroger's acceptance of the fish. After telling Kroger to dispose of the fish, Erkins called Roske and also IML's claims agent in Salt Lake, advising them that the shipment had been refused and that they should immediately send an agent to inspect the load. Although IML operates a terminal in Columbus, an IML agent did not even appear at Kroger's plant to inspect the fish until 1:00 p. m. on the following day. Kroger then already had released the fish to a rendering plant for disposition.

## II.

We need not decide whether the appropriate disposition of this appeal requires the application of local law of any particular jurisdiction.[4] Both parties agree that the

---

**3.** Thousand Springs' president explained that the trout was left on the trailer overnight because the limited refrigerator space available in its plant was already filled with processed trout awaiting loading.

**4.** The District Court's opinion reads, in part, as follows:

"It is agreed that the defendant in this action is to be regarded as a common carrier. In *Missouri Pacific Railroad Company v. Elmore and Stahl*, 377 U.S. 134, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964), the Supreme Court noted that federal law (specifically the Carmack Amendment of 1906, § 20(11) of the Interstate Commerce Act) codified the com-

controlling and common law is set forth by *Missouri Pacific Railroad Co. v. Elmore*, 377 U.S. 134, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964):

"Accordingly, under federal law, in an action to recover from a carrier for damage to a shipment, the shipper establishes his prima facie case when he shows delivery in good condition, arrival in damaged condition, and the amount of damages. Thereupon, the burden of proof is upon the carrier to show both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability." *Id.* at 138, 84 S.Ct. at 1145. (Two of the exceptions relieving the carrier of liability are that the damage was caused by the shipper himself, or the inherent vice or nature of the goods.)

In seeking to overturn the District Court's factual determinations, which were adverse to IML, IML recognizes the general rule expressed in *Purer and Co. v. Aktiebolaget Addo*, 410 F.2d 871 (9th Cir. 1969):

". . . [t]he appellants must persuade this court that such findings are, as claimed by appellants, clearly erroneous. This court must view the evidence in the light most favorable to the parties who prevailed below. Such parties must be given the benefit of all inferences that may reasonably be drawn from the evidence. The findings of the trial court sitting without a jury must be accepted unless they are clearly erroneous. They cannot be upset if they are supported by substantial evidence." *Id.* at 878.

With the foregoing principles in mind, we now turn to a discussion of the issues presented.

### III.

The District Court found that Thousand Springs had established a *prima facie* case

mon law rule that a common carrier, though not an absolute insurer, is liable for damages to goods transported by it unless it can show that the damage was caused by (a) an act of God, (b) the public enemy, (c) the act of the shipper himself, (d) public authority, or (e) the inherent vice of nature of the goods."

by showing delivery of the shipment to the carrier in good condition, the arrival of the shipment in damaged condition, and resulting damages. IML contends that the court clearly erred in reaching these findings.

### Delivery in good condition

■ We find plentiful evidence to support the trial court's finding that the fish were in "good condition" at the time they were delivered to IML. Although there was a period of time during which some of the fish were not receiving proper refrigeration, the testimony of Wold, the quality control biologist, supports the decision that the fish were suitable for consumption and sale at the time of their delivery.[5]

IML urges the adoption of a standard for perishable goods which would require that the product be in a condition to survive the transit time without damage. It would be a mistake, we believe, to confuse the law by embracing a definition of "good condition" peculiar only to perishable goods. The carrier is protected by being allowed to prove, if it can, that the damage was caused by the inherent defect or nature of the goods. The burden of proof properly rests on the carrier, a bailee for hire, in these circumstances.

### Arrival in damaged condition

Although the evidence showing that the fish arrived in Columbus, Ohio in a damaged condition was partly circumstantial, there was sufficient evidence of damage to support the District Court's finding on that issue. Furthermore, we are most assuredly not "left with the definite and firm conviction that a mistake has been committed." *United States v. U. S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

5. Since we affirm the trial judge's finding that the trout were delivered to the carrier in good condition, we need not discuss the extent of a carrier's liability for acts which contribute to the failure of the shipper to deliver the product in good condition.

Kroger employees checked a few boxes of fish at the time of the initial unloading and discerned no visible signs of decomposition; nevertheless, the warm temperature of the product caused them such concern that they immediately telephoned Thousand Springs. Following the instructions of Thousand Springs' president, the workmen at once refrigerated the produce in blast freezers and lowered the temperature of the fish to 34°. When, on the following day, numerous retail stores complained about the spoiled fish, seven to ten boxes were opened. As we have previously noted, each box contained visible indications of the decomposition of its contents. This evidence, together with reasonable inferences that can be drawn therefrom, was sufficient, especially when viewed in the light most favorable to the prevailing party, to enable the District Court to find that the fish were spoiled when delivered to Kroger.

*Proof of Damages*

■ The gist of the appellant carrier's argument on this issue is that Thousand Springs did not require Kroger to view either a larger sample or the entire load of fish, so as to show the precise amount of damages sustained. While Kroger's sample of 7 to 10 boxes may have been toward the lower end of a scale of reasonable samples of a load of the size here involved, we conclude that it was sufficient. IML was informed of the imminent destruction of the fish and could have inspected the damage for itself had it desired to do so and had sent in a representative within a reasonable time. In making a finding such as that challenged and now under consideration, the trial court is justly allowed a wide discretion. *Cf. Drake v. E. I. DuPont deNemours & Co., Inc.,* 432 F.2d 276 (5th Cir. 1970).

*Damage caused by the shipper or inherent vice of the product*

■ IML's argument that Thousand Springs failed to meet the burden of proving its *prima facie* case having been rejected, IML also urges us to hold that the damage here was solely caused by the acts of Thousand Springs or the inherent nature of fish. We decline to do so.

Thousand Springs was responsible for loading the fish onto the trailer under a "shipper's load and count" bill of lading. The effect of such a bill of lading is governed by 49 U.S.C. § 101, which provides, in part, as follows:

"The carrier may also by inserting in the bill of lading the words 'Shipper's weight, load, and count,' or other words of like purport, indicate that the goods were loaded by the shipper and the description of them made by him; and if such statement be true, the carrier shall not be liable for damages caused by the improper loading or by the nonreceipt or by the misdescription of the goods described in the bill of lading."

The fallacy in IML's position is that Thousand Springs did not "improperly load" the trailer. Rather, the damage stemmed from the defective nature of IML's truck. We have not overlooked a few very old cases wherein railroad carriers were held not liable for the *shipper's* negligence in improperly icing a refrigerator car. *See South Carolina Asparagus Growers Association v. Southern R.R.,* 46 F.2d 452 (4th Cir. 1931); *Standard Hotel Supply Co. v. Pennsylvania R. Co.,* 65 F.Supp. 439 (S.D.N.Y.1945). We do not quarrel with those opinions. They are not applicable here. Our case is wholly different because Thousand Springs had no control over the refrigeration of the truck. Under the controlling findings, IML was liable both because of its own negligence, *Missouri Pacific Railroad Co. v. Elmore, supra,* and because it accepted the load with complete knowledge of the condition of the fish. *Minneapolis, St. P. & S. S. R. R. Co. v. Metal-Matic, Inc.,* 323 F.2d 903 (8th Cir. 1963); *United States v. Savage Truck Line, Inc.,* 209 F.2d 442 (4th Cir. 1953), *cert. denied,* 347 U.S. 952, 74 S.Ct. 667, 98 L.Ed. 1098 (1954).

AFFIRMED.