**S.C. JOHNSON & SON, INC.,**
Plaintiff-Appellant,

v.

**LOUISVILLE & NASHVILLE RAILROAD COMPANY,**
Defendant-Appellee.

No. 82–1061.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 21, 1982.

Decided Nov. 29, 1982.

Rehearing and Rehearing En Banc Denied March 10, 1983.

---

Steven C. Weiss, Chicago, Ill., for plaintiff-appellant.

Bruce C. Spitzer, Gorham, Metge, Bowman & Hourigan, Chicago, Ill., for defendant-appellee.

Before PELL, and BAUER, Circuit Judges, and CAMPBELL,* Senior District Judge.

PELL, Circuit Judge.

In a period of our industrial history when one sometimes finds consumer goods failing. to be of the quality expected, it is refreshing to find a manufacturer being insistent upon its products not going into the stream of commerce unless those products meet its own high quality standards. Such an insistence can, of course, be directly reflected in an increase of manufacturing costs. The present case demonstrates that a hidden cost may also occur as a result of taking steps to pull defective products from the flow of commerce even though the diminished quality has come about without fault on the part of the manufacturer.

Seeking damages in such a situation, S.C. Johnson & Son (Johnson) brought suit under the Carmack Amendment, 49 U.S.C. § 20(11) (recodified at 49 U.S.C. § 11707), against a rail carrier for damage incurred when the carrier delivered a shipment of Johnson products some of which appeared to be frozen. The district court tried the case without a jury and held that Johnson had failed to prove the amount of damages with the requisite certainty. The court accordingly entered judgment for the defendant. Johnson now challenges this finding on two grounds: the court erred in discrediting the testimony of Johnson's main witness and in rejecting the sampling method

employed by Johnson to determine the extent of the damage.

I. Facts.

Johnson manufactures a large number of household products in its plant in Racine, Wisconsin. In January 1977, Johnson shipped by the Chicago, Milwaukee, St. Paul & Pacific Railroad Company (Milwaukee Road) and the Louisville & Nashville Railroad Company (L & N) various products to a customer of Johnson, Houchens Industries, in Bowling Green, Kentucky. Johnson employees loaded the cases onto the floor of an insulated rail car. To preheat the car, the employees had previously placed the car in a heated warehouse. When loaded into the car the lading was three to four feet high. No heater was placed in the car, some of the products being of a volatile nature.

The Milwaukee Road pulled the sealed car from Johnson's warehouse on January 10, 1977. The L & N delivered the car to Houchens's rail dock on January 25. It is not clear why this 400 mile trip took 15 days to complete. Earl Felts, receiving foreman for Houchens, broke the seals and inspected approximately 20 cases of various products from the sides, top, and each end of the car. Felts found the contents of these cases appeared to be frozen. He later could not remember which products he had examined.

Houchens notified Johnson that the shipment had arrived with frozen contents. Johnson directed Houchens to return the car to Racine. This request was in accordance with Johnson's policy of conducting all quality control tests through its own quality control department in Racine. Johnson believed that a customer such as Houchens, which operates a chain of grocery stores, was not qualified to determine if Johnson products had been damaged. Houchens complied and released the resealed car to the L & N on January 26. The Milwaukee Road returned the car to Racine on Febru-

* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

ary 21.[1] Johnson employees unloaded the car and stacked the cases on pallets in the warehouse.

Fred Manske, Technical Specialist in Johnson's quality control department, was responsible for determining the extent of the loss. Manske first segregated those products not susceptible to damage from freezing and returned them to stock. Over 2,000 cases remained to be tested. Manske did not know where the cases had been located in the car. He recognized, however, that products near the perimeter of the car would freeze faster than those in the center, and so chose cases from each pallet in an attempt to obtain a representative sample from every location in the car. He followed the sampling method set forth in Military Standard 105–D[2] in choosing the number of cases to inspect.

The tests conducted by Manske were simple. He tested Glade Solid, a gel-based air freshner, by checking for any free water that would leak from the gel during freezing. Glo-Coat, a floor polish, was tested by inspection for lumps or grain in the liquid. Aerosol products were tested by measuring the free water produced when the contents of the cans was sprayed. He found that all of the Glade Solid, Glo-Coat, Klear, Step Saver, Pledge Liquid, Pledge Aerosol, Favor and Jubilee had been damaged and ordered them scrapped. He also tested several products that were susceptible to freezing damage in theory, but which had never exhibited any actual damage in Manske's experience. None of these products were damaged. All of the testing was conducted in late March.

Manske took notes regarding the condition of each product as he performed the tests. Based upon these notes he prepared a memorandum for the salvage department, which was typed by his secretary. After reviewing the typed memorandum Manske disposed of the handwritten notes. He testified that he had not preserved the notes because they were illegible to anyone but himself and because all of the necessary information was contained in the memorandum.

## II. Prima Facie Case under the Carmack Amendment.

Johnson sued the L & N under the Carmack Amendment for the invoice value of the goods damaged by freezing. Under that Amendment a shipper must prove the following three elements to establish a prima facie case against a common carrier: (1) delivery of the goods to the carrier in good condition, (2) arrival of the goods in a damaged condition at the final destination, and (3) the amount of damage. *Missouri Pacific Railroad v. Elmore & Stahl,* 377 U.S. 134, 138, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964). Once the shipper has established a prima facie case the carrier must demonstrate that it was not negligent and that the damage was caused by one of the following events: (1) an act of God, (2) an act of the public enemy, (3) an act of the shipper, (4) an act of the public authority or (5) the inherent nature or vice of the goods. 377 U.S. at 137–38, 84 S.Ct. at 1144–45.

The Carmack Amendment was enacted to "relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods." *Reider v. Thompson,* 339 U.S. 113, 119, 70 S.Ct. 499, 502, 94 L.Ed. 698 (1950). To claim the benefits of the Carmack Amendment a shipper must sue either the carrier issuing the bill of lading or the carrier delivering the goods to the final destination. 49 U.S.C. § 11707(a)(1). Either of these carriers will be liable for damage caused by any carrier used during the trip.

---

1. Once again, it is unclear why there was such a long delay in the return trip. There was some indication at trial that Johnson could have received the car as early as February 14, but chose not to do so. We do not believe that this difference in dates affects the outcome of the case.

2. Military Standard 105–D is a sampling procedure that was adopted by the Department of Defense in 1963. Johnson regularly employs this sampling technique in testing products.

The initiating or delivering carrier may in turn seek recovery from the carrier responsible for the loss. 49 U.S.C. § 11707(b).

Initially we are presented the question of whether the journey should be characterized as one complete trip or two separate trips. Although this issue is of importance neither party addressed it until part way through the trial. When the issue was raised by the court, Johnson argued that the case involved "one whole transportation problem." The L & N understandably took the contrary position, arguing that Johnson had only brought suit for damage caused on the initial trip to Bowling Green. The judge resolved the issue by allowing Johnson to amend its complaint "to allege that the damages flowing from defendant's conduct took place over the period of time from January 10th to and including February 21st." The judge noted that "whether that will fly legally we'll worry about later."

After hearing the evidence the court found that Johnson had delivered the shipment to the Milwaukee Road in good condition, that the L & N had delivered the shipment to Bowling Green in a damaged condition, and that the shipment was damaged when delivered to Racine. Based upon the L & N's failure to explain why delivery to Bowling Green was delayed the court found that the L & N had failed to establish its freedom from negligence. Nevertheless, the court held that the sampling technique set forth in Military Standard 105–D was an inappropriate means of proving the extent of damage. Furthermore, the court was unwilling to believe that Manske had actually followed the standard. The court found that only Manske's notes could establish how many products had been tested, and that the destruction of the notes justified an inference that the contents of the notes would be unfavorable to Johnson. Because the court found that Johnson had failed to prove the amount of damage at both Bowling Green and Racine it did not resolve which was the proper destination. We believe that a correct analysis of this case requires resolution of that issue.

### III. One Trip or Two?

The proper characterization of this ill-fated journey is of more than academic interest. If there was but one trip, from Racine to Racine via Bowling Green, then the Milwaukee Road was both the initial and delivering carrier and the L & N is not a proper defendant under the Carmack Amendment. If, on the other hand, a new trip began when the car was released to the L & N, then Johnson has at least sued the right defendant. This characterization, however, presents Johnson with a problem similar to that confronted in *Rodin v. Atchison, Topeka & Santa Fe Railway,* 477 F.2d 682 (5th Cir.1973). Plaintiff in *Rodin* shipped Maine potatoes from various intermediate places to Chicago. The shipment arrived much the worse for wear. Plaintiff then engaged defendant to transport the spoiled vegetables to Texas in the hope of selling them to be reconstituted. When the potatoes arrived in Texas they were worthless. After being instructed that Texas was the proper destination, the jury found for defendant. On appeal plaintiff urged that Chicago was the correct destination at which to measure damages. The court observed that plaintiff's argument meant that a new trip had begun in Chicago and that the potatoes had therefore been delivered in that city to defendant in a damaged condition. Thus plaintiff had no cause of action under the Carmack Amendment. Similarly, Johnson claims that the goods were already damaged when delivered to Bowling Green. By its own admission, then, Johnson did not deliver the shipment in a good condition for the return trip. Under the two-trip characterization Johnson may only recover under the Carmack Amendment for the damage incurred during the initial leg of the journey.

Whether a new trip began when Houchens released the car to the L & N is a question of fact. *See Season-All Industries, Inc. v. Merchant Shippers,* 451 F.Supp. 727, 731 (W.D.Pa.1978); *cf. United States v. Mississippi Barge Line Co.,* 285 F.2d 381,

393 (8th Cir.1960). A common sense examination of the facts of this case reveals that this journey is properly divided into two trips. Neither Johnson nor the carriers contemplated making a shipment from Racine to Racine via Bowling Green. The original bill of lading, issued by the Milwaukee Road, provided for shipment to Bowling Green. Once the L & N delivered the car to Houchens's rail dock that trip was at an end. The L & N was under no further duty to transport the goods nor did the Carmack Amendment apply to any further damage. *Chicago & North Western Railway v. Union Packing Co.*, 514 F.2d 30 (8th Cir.1975); *Fraser-Smith Co. v. Chicago Rock Island & Pacific Railway*, 435 F.2d 1396, 1399 (8th Cir.1971). Houchens was obligated to accept the shipment unless it was so badly damaged as to be worthless, so Houchens's rejection did not place the L & N under any obligation to return the car to Johnson. *Id.* at 1399. Johnson paid an additional fee for the return trip, and the L & N issued a new bill of lading.[3]

We also believe that characterizing this round trip as one journey would not be consistent with the purpose of the Carmack Amendment. The Carmack Amendment places upon the initial or delivering carrier the burden of determining which of possibly many carriers was responsible for the damage. It is reasonable to place this burden upon the carrier when an uninterrupted shipment is involved. In this situation the carrier is better able to make that determination than the shipper, who may not even know which intermediate carriers were used. The Amendment, however, does not contemplate placing this burden upon a carrier when the shipment has been interrupt-

ed and the goods placed in the possession of the consignee before being reshipped. In this situation the shipper is capable of determining whether the damage occurred before delivery to the consignee or after. Having determined on which leg of the trip the goods were damaged the shipper may then sue the proper initiating or delivering carrier. Moreover, we agree with the observation of the Fifth Circuit that: "Any contra interpretation of Carmack would allow a shipper who has discovered that his goods were damaged to shop around for a solvent carrier on which it could ship its damaged goods and later sue for damages." *Rodin v. Atchison, Topeka & Santa Fe Railway*, 477 F.2d at 688.

## IV. Proof of Damages.

### A. Negative Inference from Destruction of Manske's Notes

The success of Johnson's case rests upon its ability to prove the amount of damages at Bowling Green. The first issue in this respect is whether the trial court erred in inferring that the contents of Manske's notes would reveal that he had not sampled the products properly. The court based this inference upon the maxim *omnia praesumuntur contra spoliatorem*, application of which involves a two step process. First the court must be of the opinion from the fact that a party has destroyed evidence that the party did so in bad faith. Only then may the court infer from this state of mind that the contents of the evidence would be unfavorable to that party if introduced in court. The crucial element is not that the evidence was destroyed but rather the reason for the destruction. This has been recognized by

---

**3.** Our decision would not be altered had the L & N failed to issue a new bill of lading. As long as a new shipment was begun the L & N would be liable as the initial carrier regardless of whether a new bill was issued. 49 U.S.C. § 11707(a)(1). Conversely, the issuance of a new bill of lading by an intermediate carrier does not terminate the liability of the initial carrier. Rather, the new bill is void for lack of consideration. *Mexican Light & Power Co. v. Texas Mexican Ry.*, 331 U.S. 731, 67 S.Ct. 1440, 91 L.Ed. 1779 (1947). However, a new bill of

lading is some indication that the parties considered the return trip to be a new shipment.

Johnson has argued that the reference on the waybill issued by the L & N to the original bill of lading evidences the L & N's intention to treat the entire journey as one trip. That the L & N indicated that the shipment was being returned because of freezing does not persuade us that only one trip was involved. Parenthetically, we note that it is odd that Johnson insists that only one trip was involved as that would eliminate the L & N as a proper defendant.

most courts that have addressed the issue. The First Circuit stated the general rule:

> It is elementary that if a party has evidence ... in its control and fails to produce it, an inference may be warranted that the document would have been unfavorable. *However ... it must appear that the party had some reason to suppose that non-production would justify the inference ... the totality of the circumstances must bring home to the non-producing party notice that the inference may be drawn.*

*Commercial Insurance Co. of Newark v. Gonzalez,* 512 F.2d 1307, 1314 (1st Cir.1975), *cert. denied,* 423 U.S. 838, 96 S.Ct. 65, 46 L.Ed.2d 57 (emphasis added). *See also Vick v. Texas Employment Commission,* 514 F.2d 734 (5th Cir.1975); *Smith v. Uniroyal,* 420 F.2d 438 (7th Cir.1970); *INA Aviation Corp. v. United States,* 468 F.Supp. 695 (E.D.N.Y. 1979), *aff'd mem.,* 610 F.2d 806 (2nd Cir.).

■ We do not think that the facts surrounding Manske's destruction of his notes support an inference of bad faith. Manske prepared the notes in the course of determining which products should be scrapped by the salvage department. The information in the notes was typed in the form of a memorandum. At that time Manske would have had no reason to alter or omit necessary information. It is not clear to us that the notes contained any information that did not also appear in the final memorandum. Manske testified that: "I made handwritten notes on my findings, the actual condition of the product, whether there was or was not damage." There is no indication that Manske went beyond this and made notes regarding the sample size or tests performed. The salvage department was only interested in knowing which products should be saved. Under these circumstances we find that there was no basis for rejecting Manske's explanation for the destruction of his notes. We reject any inference that Manske did not perform the tests or follow the sampling method set forth in Military Standard 105–D. Our reading of the record indicates that this was the sole reason for discrediting Manske's testimony. Of course, had the court found that Manske

was an incredible witness for other reasons, such as his demeanor, we would respect that finding. This was not the case, however, so we will proceed on the assumption that Manske testified truthfully.

*B. Sufficiency of the Sample*

Turning to the procedures followed by Manske in determining the extent of the damage, there is no question that the tests performed by him were sufficient to determine whether the products were damaged. Rather, the issue is whether he tested a sufficient number of each product to justify the conclusion that the entire shipment of products susceptible to freezing was damaged.

■ It is beyond peradventure that the extent and amount of damages to an entire shipment may be extrapolated from a representative sampling. *Thousand Springs Trout Farms v. IML Freight, Inc.,* 558 F.2d 539 (9th Cir.1977); *Compagnie De Navigation, Etc. v. Mondial United Corp.,* 316 F.2d 163 (5th Cir.1963); *Imperial Veal & Lamb Co. v. Caravan Refrigerated Cargo, Inc.,* 554 F.Supp. 499 (S.D.N.Y.1982); *Amstar Corp. v. M/V Alexandros T.,* 472 F.Supp. 1289, 1297 (D.Md.1979); *Interstate Steel Corp. v. S.S. "Crystal Gem,"* 317 F.Supp. 112, 121 (S.D.N.Y.1970); *Royston Distributors, Inc. v. Moore-McCormack Lines, Inc.,* 252 F.Supp. 480, 488 (E.D.Pa.1965); Wood, *Damages in Cargo Cases,* 45 Tul.L.Rev. 932, 945 (1971).

■ A sampling will be accepted as proof of damages when "a reasonably representative sample has been taken and so long as the sample is sufficient to indicate fairly the quality, condition and nature of damage to the whole cargo." *Amstar Corp. v. M/V Alexandros T.,* 472 F.Supp. at 1297. The court here held that the sampling technique employed by Johnson, Military Standard 105–D, was not a proper means of establishing damages. This holding was largely based upon the court's interpretation of the stated purpose of the standard. The court relied upon Paragraph 5.2 of the document, which states:

Each lot or batch shall, as far as is practicable, consist of units of product of a single type, grade, class, size, and composition, manufactured under essentially the same conditions and at essentially the same time.

The court seems to have determined that the reference to products being "manufactured" precluded application of the sampling standard to "merchandise which may have been affected differentially by differential exposure to natural conditions subsequent to its manufacture." We reject this limitation for two reasons. Initially, we note that the quoted paragraph does not purport to limit the scope of the sampling technique, but rather simply describes the desirability of uniform batches. The intended scope of the sampling plan is set forth in Section 1 of the document, Paragraph 1.2 of which reads as follows:

APPLICATION. Sampling plans designated in this publication are applicable, *but not limited,* to inspection of the following:

a. End items
b. Components and raw materials
c. Operations
d. Materials in process
e. Supplies in storage
f. Maintenance operations
g. Data or records
h. Administrative procedures.

(emphasis added).

It is clear that this sampling plan was intended to encompass more than just manufacturing. The court was concerned that the sampling plan was only applicable to products uniformly affected by a process or event, such as manufacturing. Yet "supplies in storage" and "raw materials" are as much subject to varying conditions as the products in this case.

Of more significance, though, than the stated scope of the standard is whether its application was reasonable in this case. Manske testified that he chose products to sample so as to obtain a representative selection from all locations in the car. In addition, he stated that he was conservative in the application of the sampling standard to ensure the validity of the sample. Upon these facts, we find that the sampling procedures set forth in Military Standard 105–D were a sufficient basis from which to extrapolate the amount of damage to the whole shipment. To require, as would the trial court, a plaintiff to test every case in a carload shipment would be impracticable and serve little purpose.

*C. Damage to the Shipment in Bowling Green*

■ That the shipment was damaged when inspected in Racine during March, however, does not establish that the damage existed when delivered to Bowling Green in January. Almost two months had elapsed between Felts's examination and Manske's. We have no basis for determining that the damage was not caused, or at least aggravated, during the second leg of the journey, which also occurred in winter weather. Manske admitted this much during cross-examination.

Q: Can you tell me, based on the tests that you conducted sometime after February 21st—that was the return of the car—based on these tests that you conducted, can you tell what the condition of the Glo-Coat was in Bowling Green on January 25?

A: Of course not.

We are left with only Felts's cursory examination as proof of damage in Bowling Green. Johnson did not believe that Felts was qualified to determine if the shipment was damaged, and on the facts of this case we are hesitant to disagree. All that Felts determined was that several cases near the perimeter of the car were frozen. As Manske stated during trial, freezing does not necessarily cause damage. Several of the products could be frozen without harm. At least one product, Pledge Aerosol, may have been damaged by age rather than freezing. Felts did not even determine the extent of the freezing, checking only those cases most likely to freeze.

Although Felts's findings are enough to preclude Johnson from proving that the shipment was redelivered to the L & N in

good condition, they are not enough to establish the *amount* of damage. Concededly there was some indication of damage at Bowling Green, but damages "may not be awarded on the basis of conjecture or speculation and the admitted fact of damage is insufficient to prove the amount of damage." *Locklin v. Day-Glo Color Corp.,* 429 F.2d 873, 879 (7th Cir.1970), *cert. denied,* 400 U.S. 1020, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971); *see also Alover Distributors, Inc. v. Kroger Co.,* 513 F.2d 1137, 1140–41 (7th Cir.1975). A finding that several cases of unidentified products appeared to be frozen is simply an insufficient basis for holding that the shipment was damaged to the extent found to exist by Manske.

For the foregoing reasons, the decision of the district court is

AFFIRMED.