F D L FOODS, INC., Plaintiff-Appellee, v. KOKESCH TRUCKING, INC., Defendant-Appellant (Farris L. Waterworth Brokerage, Inc., Defendant).

Second District   No. 2—91—1099

Opinion filed August 19, 1992.

Bruce A. Brown and Bruce Goldsmith, both of Goldsmith, Thelin, Schiller, Dickson & Brown, of Aurora (Margaret A. Gisch, of counsel), for appellant.

Bauer & Heckmann, P.C., of Dubuque, Iowa, and Erickson & Sederstrom, of Omaha, Nebraska (James Heckmann, of counsel), for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Kokesch Trucking, Inc. (Kokesch), appeals from the judgment of the circuit court of Ogle County finding it liable as a carrier to the shipper, plaintiff F D L Foods, Inc. (FDL), under the Carmack Amendment to the Interstate Commerce Act (Carmack Amendment) (49 U.S.C. §11707 (1988)) for economic loss sustained by

FDL to a load of fresh pork trimmings carried from FDL in Rochelle, Illinois, to the buyer, Oscar Mayer & Company in Los Angeles, California. Mechanical difficulties with the truck were experienced en route, and the required 20-degree temperature in the refrigerated truck trailer was not maintained. The meat became "off-condition" (spoiled, essentially) and was rejected by the buyer when finally delivered. Kokesch denied it was the carrier claiming it only put the carrier, truck owner-operator Greg Dixson, in touch with defendant Farris L. Waterworth Brokerage, Inc. (Waterworth). Waterworth was the broker hired by FDL to arrange for carriage of its pork to Los Angeles. Waterworth, which did not appear for trial, was also found liable to FDL under the Carmack Amendment as the broker who arranged for transportation, but it is not a party to this appeal. The court granted Kokesch's cross-claim for contribution against Waterworth and dismissed as moot Kokesch's third-party claim for indemnity or contribution against Dixson, whom the parties were unable to find to serve with process.

Kokesch contends here that the evidence failed to establish that it was the carrier in law or fact and that it was prejudiced by the admission of inadmissible hearsay evidence.

Late in July 1986, FDL's transportation manager for its Rochelle, Illinois, plant, Jack Bradshaw, contacted transportation broker Waterworth to arrange carriage for two loads of fresh pork from the Rochelle plant. Both loads were to be carried by McIntosh Truck Lines, but one of the McIntosh vehicles had a mechanical breakdown. Waterworth then sought another carrier and advised Bradshaw that he had arranged for Kokesch Trucking, Inc., to take the remaining load. Bradshaw testified that notes he took during his conversation with Waterworth showed Greg Dixson was an owner-operator and that Dixson's insurance had expired.

For his own use and for the use of the Rochelle shipping department, Bradshaw prepared a shipping lineup sheet. Amongst the numerous other entries, the sheet showed the name of the truck line carrying the load (Kokesch was designated thereon as "Koke"), the number of the trailer into which the meat was to be loaded (59-R141), the estimated weight of the meat (40,000 pounds), and the temperature at which the meat must be kept (20°). It also indicated the pickup date (8/1/86), delivery date (8/5), and the purchaser (Oscar Mayer, Los Angeles). The load was not actually picked up until Saturday, August 2. The delay in departure was, at least in part, because there was not enough fresh pork to fill Oscar Mayer's order.

The following Tuesday, August 5, Waterworth telephoned Bradshaw to advise that the truck carrying the load had broken down and that delivery would be delayed until the next day, August 6. Waterworth then called Bradshaw again to advise him that the truck repairs took longer than expected and the driver would not arrive with the load until late in the afternoon on Wednesday, August 7. The next contact Bradshaw had with Waterworth was on Thursday, August 8, when Waterworth called him. By that time, both Bradshaw and Waterworth had been informed that the meat was "off-condition" when it arrived at its destination and that it had been rejected by Oscar Mayer. Bradshaw never spoke with the drivers of the truck, Greg Dixson or Joel Jameson, and never had any contact with Kokesch. All arrangements were handled through FDL's transportation broker, Waterworth.

The bill of lading prepared by FDL that was issued for its load of pork shows "Kokesch Trucking, Inc.," on its face as the carrier. The "agent" line is signed by Greg Dixson. Bradshaw and FDL shipping supervisor Charles Hall testified about the security precautions taken at the FDL Rochelle plant to insure that only scheduled trucks enter the plant to be loaded. When a truck driver pulls up to the front gate of the plant, he identifies himself, along with the name of the common carrier, to the security officer there. The security officer checks the identity of the carrier against Bradshaw's lineup sheet for loads to be shipped out of the plant. Upon confirming that the common carrier is indeed scheduled to pick up a load, the security officer weighs the truck on the plant's scales at the front gate and directs the driver to a location inside the plant facility where his trailer can be washed out. If a motor carrier arrives that is not on Bradshaw's lineup sheet, the security officer does not permit the truck to enter the plant property without authorization from Bradshaw or the plant shipping department.

From the wash area, the driver calls the shipping office, identifying himself, the name of the motor carrier, and his trailer number. The shipping department compares this information with a copy of the lineup sheet prepared by Bradshaw, tells the driver to set his refrigeration unit at the required temperature, and then "spots" the trailer by directing the driver to pull his trailer up to a numbered dock door. The name of the motor carrier, trailer number, and dock door are then recorded on a shipping lineup sheet for that particular load. The truck's trailer number is painted on the inside surface near the rear of the trailer. Because the trailer pulls up to an enclosed, refrigerated loading dock, the person loading the trailer frequently

would not see either the exterior of the trailer, the tractor, or the driver. The significance of the trailer number is that it is a final check for the FDL person loading that vehicle at the assigned dock door that the correct truck has pulled up to its assigned dock door. The trailer number "R141," which was recorded on the lineup sheet prepared by Bradshaw from the information given to him by Waterworth, also appears on the shipping lineup sheet prepared by the shipping department when the truck is "spotted." After being loaded, the truck is driven to the security gate at the plant entrance where the driver must sign and pick up the bill of lading in order to get out of the gate. Hall stated he did not see the exterior of the truck which picked up the FDL load, and he did not know whether the truck belonged to Greg Dixson or to Kokesch. Many truck lines do not have any words on the outside, only numbers such as trailer numbers or ICC numbers.

According to his evidence deposition testimony, Farris Waterworth's first contact with Kokesch occurred several months prior to the shipment of the load of meat at issue. Waterworth was initially contacted by Tom and Pat Van Donselaar. The Van Donselaars represented themselves to be working for Kokesch and solicited Waterworth's services as a broker for Kokesch. Waterworth advised the Van Donselaars that he required certain information from Kokesch, including, but not limited to, its ICC authority as a motor carrier and proof of insurance coverage. Some, but not all, of this requested documentation was forwarded to Waterworth by Kokesch vice-president Roxanne Kokesch with a cover letter dated February 20, 1986. Subsequently, Waterworth received a call from a woman named Janelle who reported to him that she worked for Kokesch and was calling him "looking for loads." Because Waterworth had not yet had a chance to view Kokesch's operation in person, as was his usual practice, and did not have all the requested information, he did not broker any loads to Kokesch at that time.

Janelle Wieland, formerly known as Janelle Reddemann, was hired on April 21 and employed as of April 28, 1986, in Kokesch's dispatch department. She was classified at that time as a "broker." Part of her wages were paid under a Job Partnership Training Act (JPTA) grant. According to JPTA grant documents prepared by Kokesch, 400 of Janelle's 500 hours of on-the-job training were to be focused on sales. Her duties in sales were described on the documents as "contacting trucking firms and shippers and arranging freight loads from one location to another."

On August 1, 1986, Janelle contacted Waterworth to seek available loads for Kokesch. At the time of the call, Waterworth had none. Later that day, the McIntosh vehicle broke down, making it unavailable to pick up the FDL load. Janelle and Waterworth had another telephone contact at which time Waterworth advised Janelle that there was a load available for Kokesch. Waterworth told Janelle of the requirements for the load, including the requirement that the equipment be Kokesch equipment and drivers (two) and that it be a 45-foot-long refrigerated trailer. Waterworth told Janelle that the drivers should be Kokesch drivers and should make their schedule so the delivery would be on the morning of August 5 and that they should report to him en route, after calling Kokesch, if they had any problems which delayed the load so that he could inform Bradshaw. At this time, Waterworth had Kokesch's insurance and authority certificates in his file.

Janelle then later called Waterworth back and gave him the tractor and trailer numbers and the names of the drivers (Greg Dixson and Joel Jameson) and received instructions from Waterworth as to when and where the load of pork was to be picked up at FDL. Waterworth relayed this information to Bradshaw. Waterworth's wife later that evening took a call from Greg Dixson, who was reporting in, and who said he was with another driver, Joel Jameson.

The load of pork was picked up by Greg Dixson at FDL on August 2. When the truck broke down en route to Los Angeles, Waterworth was advised of the breakdown by Joel Jameson. At some point during the haul, Waterworth was informed that Dixson had gone to San Antonio due to an emergency. Kokesch wired money to Jameson for the truck repairs; the money was in the nature of a "com-check" or "comp-check" which Greg Kokesch testified was an advance on monies owed Dixson for past hauls of ICC-exempt loads he had made for Kokesch. The first amount wired was insufficient to pay the repair bill, and, at Waterworth's demand, Kokesch wired a second sum.

When the load of pork was rejected by Oscar Mayer in Los Angeles, FDL corporate transportation manager in Dubuque, Iowa, Joseph Spurling, received a phone call from Chuck Nelson, who Spurling stated represented himself to be a vice-president of Kokesch Trucking. Nelson did not testify at trial. Nelson, who, as near as may be determined from the record, was advised by Waterworth that a Kokesch load had gone bad, asked Spurling what FDL wanted Nelson to do with the load of spoiled meat. After being advised by Spurling that it was FDL's position that Kokesch now owned the meat, Nelson

asked Spurling for help in salvaging the load. Spurling asked Nelson to acknowledge that Kokesch would stand the loss on the load. Nelson confirmed that Kokesch would stand behind the loss, and Spurling then advised Nelson that FDL would try to help salvage the meat and would be in contact with him at a later time. Greg Kokesch was out of town at the time these salvaging efforts were being undertaken; he testified at trial that Chuck Nelson was never a vice-president of Kokesch but that he was the broker who ran Kokesch's San Antonio, Texas, office.

Spurling then contacted Dennis Bandy, who was in pork sales at FDL. Bandy is the one who had sold the load of pork to Oscar Mayer and who had already been in contact with Oscar Mayer about the condition of the load upon its arrival. Spurling told Bandy to sell the load for the highest price available and gave Bandy Nelson's telephone number at Kokesch. Bandy telephoned Nelson and received Nelson's approval to try to salvage the load.

The next morning, August 8, Nelson telephoned Bandy. Bandy informed him that he was not able to find anyone interested in buying the load. Nelson then asked Bandy to seek a bid from renderers. Bandy asked Nelson if Kokesch's insurance adjusters needed to view the load of meat before it was sold to a rendering company, and Nelson advised Bandy that Kokesch was satisfied about the condition of the meat with the information then available to it. Bandy then received an offer to purchase the meat which he relayed to Nelson. Nelson advised Bandy to take the bid. Bandy again asked Nelson if Kokesch's insurance adjuster needed to view the load before it was sold, and Nelson told him no. Thereafter, Bandy telephoned Waterworth to advise Waterworth of the bid on the meat. Waterworth told Bandy that the bid was acceptable to him and also told Bandy that it was not necessary for Waterworth's insurance adjuster to view the load before it was sold. The load ultimately was sold to a company called Hoffman Brothers through broker Midland Foods for $13,060.95. The loss on the load, less shipping costs, was $25,692.96.

It was Greg Kokesch's testimony at trial that when Farris Waterworth contacted Kokesch on August 1, he was told that Kokesch did not have any trucks available for the haul; FDL was not on Kokesch's list of approved shippers which, Greg testified, is required before Kokesch will ship a load. Later, Greg Dixson, a truck owner-operator with whom Kokesch had done business in the past, called Kokesch looking for work. Dixson had recently delivered a load to Aurora and was in the area. Kokesch had no work for him, so it gave

him a referral to Waterworth by giving him Waterworth's phone number.

Greg Kokesch testified that Kokesch and Dixson had no ongoing contractual or employment relationship but, on occasion, Kokesch had brokered loads to Dixson that were exempt from ICC tariffs. Three such exempt loads were hauled by Dixson for Kokesch in the months preceding the instant events. Dixson did not possess ICC authority for nonexempt hauls like one performed for FDL; Greg Kokesch stated he did not know the contents of FDL's load before he put Dixson in touch with Waterworth. Greg Kokesch also testified that, prior to the instant contact with Waterworth, Kokesch had no knowledge of Waterworth. Further, Janelle Wieland was a trainee and had no authority to deal with brokers such as Waterworth but, rather, was authorized to deal with shippers and book loads for Kokesch. Kokesch specifically denied any employment relationship or short-term or long-term contractual relationship with Greg Dixson for the FDL haul or otherwise. When FDL and Waterworth subsequently sent bills to Kokesch for the value of the lost meat and for a brokerage fee, Kokesch immediately returned both bills indicating that Dixson, and not Kokesch, was the responsible party.

The central issue in this cause is whether the court's judgment was against the manifest weight of the evidence. A subissue is whether the court erred in considering the deposition testimony of Farris Waterworth concerning his telephone conversations with Janelle Wieland. Although Kokesch claims the relevant facts are undisputed and, thus, this court may decide the issue as a matter of law, it is obvious that the role played by Kokesch in the underlying events is in acute contravention.

The standard of review to apply when a challenge is made to the trial court's ruling following a bench trial is whether the trial court's judgment is against the manifest weight of the evidence, that is, an opposite conclusion must be clearly evident before reversal is warranted. (*Bruss v. Klein* (1991), 210 Ill. App. 3d 72.) The trial court's findings must be given great deference because the trial court has the opportunity to view and evaluate witnesses' testimony and is, therefore, in the best position to evaluate their credibility. (*In re Application of County Treasurer* (1989), 131 Ill. 2d 541; *DeLong v. Cabinet Wholesalers, Inc.* (1990), 196 Ill. App. 3d 974.) For a judgment to be found to be against the manifest weight of the evidence, the appellant must present evidence that is so strong and convincing as to overcome completely the evidence and presumptions, if any, existing in appellee's favor. *Ruggio v. Ditkowsky* (1986), 147 Ill. App. 3d 638.

The Carmack Amendment to the Interstate Commerce Act (Revised Interstate Commerce Act (49 U.S.C. §11707 (1988))) provides that any common carrier delivering property and providing transportation subject to the jurisdiction of the Interstate Commerce Commission (ICC) is liable to the person entitled to recover under the receipt or bill of lading. The liability imposed is for actual loss or injury to the property. (49 U.S.C. §11707(a)(1) (1988).) The liability imposed under the Carmack Amendment extends to brokers under the provisions of 49 U.S.C. §§10924(b), (e) (1988). A shipper establishes a *prima facie* case against the carrier under the Carmack Amendment when it shows delivery of the goods to the carrier in good condition, arrival of the goods in damaged condition, and the amount of damage. (*S.C. Johnson & Son, Inc. v. Louisville & Nashville R.R. Co.* (7th Cir. 1982), 695 F.2d 253; *Thompson v. James G. McCarrick Co.* (5th Cir. 1953), 205 F.2d 897.) The burden then shifts to the carrier to show the cause of the damage and that it is not liable therefor. (*McCarrick*, 205 F.2d at 900.) It is undisputed that the meat was delivered in good condition to the vehicle driven by Greg Dixson, that it arrived at Oscar Mayer in damaged condition, and that the loss on the meat sustained by FDL was $25,692.96. The crux of the dispute is whether Greg Dixson's carriage of the meat was performed as an agent of Kokesch, as FDL argues, or as an independent owner-operator as Kokesch argues.

We believe the court's judgment that Kokesch was the carrier is not against the manifest weight of the evidence and reversal is not warranted. Kokesch's first argument, that it was not the carrier as a matter of law, is premised on its view of the evidence which, it asserts, shows that Waterworth arranged the shipment with Dixson for FDL based on a contact "facilitated" by Kokesch, that is, that Kokesch simply referred Dixson to Waterworth by giving him Waterworth's number. However, there is no evidence whatever that Waterworth spoke to Dixson at any time prior to Dixson "reporting in" to pick up the load at FDL. On the other hand, there is substantial evidence that Waterworth arranged the FDL shipment with Kokesch's employee, Janelle Wieland.

We find meritless Kokesch's argument that the lack of evidence of the compensation to be paid it for making the haul negates a finding that it was the carrier since, by definition, a "motor common carrier" is "a person holding itself out to the general public to provide motor vehicle transportation for compensation over regular or irregular routes, or both." (49 U.S.C. §10102(14) (1988).) This argument ignores the evidence that Kokesch had ICC authority as a broker as well as a

carrier, or that Dixson may have been operating under a "trip-lease," a one-time lease by an owner-operator to a company with ICC authority. Kokesch testified that "a broker lines up a load for a truck and moves a load for a shipper." Although Kokesch denied it at trial, a reasonable inference can be drawn from the record that the "facilitating" done by Kokesch here was more than a referral. Rather, either Greg Dixson was hauling the load as Kokesch's agent or Kokesch was acting as a secondary broker of the FDL load to Dixson. Kokesch cites no authority for the proposition that there must be evidence of the compensation to be paid to it before there can be a finding that it was the carrier.

FDL's knowledge, by way of Waterworth, that Dixson was an owner-operator and that his insurance had not been renewed also does not preclude the court's finding that Kokesch was liable. The expired insurance referred to may have been Dixson's comprehensive insurance (fire, theft and collision) as opposed to the cargo and equipment liability insurance which carriers who seek to augment their equipment by means of owner-operator leases are required under ICC regulations to carry. (See *George Transfer & Rigging Co.* (1974), 208 NLRB 494, 1974 NLRB Dec. (CCH), par. 26,138.) An owner-operator who owns his or her own tractor and trailer can lease on to a company with ICC authority and then operate under that carrier's authority and insurance. *George Transfer & Rigging Co.*, 208 NLRB 494.

Kokesch contends that in order for it to be found to be the carrier for FDL, some relationship between it and Dixson must be shown. (*United States v. Seaboard Coastline R.R.* (E.D. Va. 1974), 384 F. Supp. 1103, *rev'd on other grounds* (4th Cir. 1975), 517 F.2d 881.) Kokesch argues this relationship is not shown where there is no evidence that the truck was a Kokesch truck (indicative of an employment relationship) or that there was a lessor-lessee relationship between it and Dixson. FDL argues in response that Dixson was acting as an agent of Kokesch for the carriage of this load of meat and that Kokesch is liable under the Carmack Amendment for FDL's losses where the carriage by Dixson was arranged by Kokesch and was performed under Kokesch's ICC certificate of authority.

Despite Kokesch's argument to the contrary, there is evidence that Dixson was acting as Kokesch's agent in hauling FDL's load. Whether Dixson was driving his own truck or one of Kokesch's, he nonetheless had to have represented himself as being with Kokesch in order to gain entry to the FDL premises based on the security procedures testified to at trial by FDL's Charles Hall. Further, the bill of lading showed "Kokesch" as the carrier, and Dixson signed the bill as

"agent" in order to exit FDL's plant. Also, it is evident that when the truck broke down, the driver or drivers must have contacted Kokesch first seeking repair funds, since later, when Waterworth was asked to intercede, it was to request *more* funds since the first funds sent were insufficient. Upon Waterworth's insistence, Kokesch then sent more money to Jameson.

Kokesch argues its advance of these funds does not negative Dixson's independent contractor status since it may advance up to 50% of the gross revenues of any load and later deduct that amount from the ultimate payment check for that load without the contractor losing its independent status. (See *George Transfer & Rigging Co.* (1974), 208 NLRB 494, 1974 NLRB Dec. (CCH), par. 26,138; *National Freight, Inc.* (1965), 154 NLRB 133.) The funds advanced here had nothing to do with this load, however; Kokesch testified the funds were an advance on the funds owed Dixson for three prior hauls of exempt loads which Kokesch had brokered to him. Greg Kokesch testified that, as of the time of trial, Dixson had been paid in full for the exempt loads he hauled for Kokesch. There was no evidence, however, that the funds advanced for the FDL load were deducted from the amount owed on Dixson's prior exempt hauls, and it is unclear when or how or even why Kokesch paid Dixson that amount when Dixson could not be found to answer Kokesch's complaint against him for indemnity or contribution.

Another indication that Dixson was acting as Kokesch's agent is the well detailed role which Kokesch employee Chuck Nelson played in Kokesch's acceptance of the responsibility for the loss and its initiative in engaging FDL's assistance in salvaging what it could of the spoiled load of meat.

Kokesch's argument that FDL must be presumed to have assumed the risk of loss where it was aware that Dixson's insurance had expired is without merit. It is true that insurance is required by the Interstate Commerce Act before a carrier's interstate transportation of goods will be authorized by the ICC. (49 U.S.C. §10927(a)(1) (1988).) FDL cannot be held to have assumed the risk of loss, however, where it is evident that FDL, having brokered the load through Waterworth, believed that Kokesch, or Dixson as its agent, was operating under Kokesch's ICC authority and insurance. FDL did not have information in its files on Kokesch or Dixson because it was using Waterworth's brokerage services, and Waterworth had Kokesch's ICC authority and insurance certificates on file.

Because it was the most prejudicial evidence offered against it at trial, Kokesch argues the conversations between Waterworth and

Janelle Wieland were inadmissible hearsay evidence where no foundation for her authority as Kokesch's agent was established. Wieland did not testify at trial.

We see no error in the court's admission of evidence of Janelle Wieland's conversations with Farris Waterworth. The formula for determining whether Janelle Wieland's conversations were inadmissible hearsay or properly admitted as admissions of her principal, Kokesch, is whether they occurred within the scope of the authority of the agent to speak or write for Kokesch. (McCormick, Evidence §267, at 640 (2d ed. 1972).)

> "This formula makes it plain that the statements of an agent employed to give information may be received as the employer's admissions, regardless of want of authority to act otherwise, and conversely that authority to act, e.g., the authority of a chauffeur to drive a car, would not carry with it automatically the authority to make statements to others describing what he was doing or had done." McCormick, Evidence §267, at 640-41.

An agent's authority may be actual or apparent, and actual authority may be either express or implied. (*Illinois Armored Car Corp. v. Industrial Comm'n* (1990), 205 Ill. App. 3d 993; *Wadden v. Village of Woodridge* (1990), 193 Ill. App. 3d 231.) An "apparent agent" is a person who, whether authorized or not, reasonably appears to third persons, because of acts of another, to be authorized to act as agent for such other person. (*Mitchell Buick & Oldsmobile Sales, Inc. v. National Dealer Services, Inc.* (1985), 138 Ill. App. 3d 574; *A.H. Gruetzmacher & Co. v. Massey-Ferguson, Inc.* (N.D. Ill. 1981), 512 F. Supp. 194.) The doctrine of apparent agency is based on the doctrine of equitable estoppel, and there is no practical difference between them. *Northern Trust Co. v. St. Francis Hospital* (1988), 168 Ill. App. 3d 270.

■ The existence of an agency relationship is a question of fact (*Matthews Roofing Co. v. Community Bank & Trust Co.* (1990), 194 Ill. App. 3d 200), and the party asserting the agency relationship has the burden of proving the agency's existence by a preponderance of the evidence (*In re Estate of Maslowski* (1990), 204 Ill. App. 3d 379; *A.H. Gruetzmacher & Co.*, 512 F. Supp. at 198). A *prima facie* case of agency can be created by inference or circumstantial evidence (*Stefani v. Baird & Warner, Inc.* (1987), 157 Ill. App. 3d 167; *Lundberg v. Church Farm, Inc.* (1986), 151 Ill. App. 3d 452), and a *prima facie* case of agency is established where there are facts showing one acting for another under circumstances implying knowledge of such acts

by the supposed principal (*People v. Parsons Co.* (1984), 122 Ill. App. 3d 590; *Mateyka v. Schroeder* (1987), 152 Ill. App. 3d 854).

■ The Waterworth-Wieland conversations were admissible; they occurred within the scope of Janelle's authority to speak for Kokesch. Janelle had contacted Waterworth prior to the instant cause seeking loads for Kokesch. Greg Kokesch's testimony at trial that he never heard of Waterworth before and that Kokesch did not use the services of brokers is totally belied by Waterworth's deposition testimony concerning the Van Donselaars' contacts with him and the copy of Roxanne Kokesch's February 1986 letter transmitting Kokesch's ICC certificate of authority to Waterworth in which she states in part: "We are looking forward to doing business with you in the very near future." The fact Waterworth stated he knew Janelle was working "under Dick Penk's supervision" (Dick Penk, along with Greg and Roxanne Kokesch, operated Kokesch's Minnesota office) only makes more apparent Janelle's authority to make the instant load arrangements since Waterworth was entitled to presume from that knowledge that Dick Penk sanctioned Janelle's calls to him.

Kokesch's point is well taken that neither Janelle's employment application nor Kokesch's application for the JPTA grant for her on-the-job training could have enhanced Waterworth's perception of Janelle's apparent authority since he had no knowledge of those documents at the time the load arrangements were made. Those documents do, however, seriously damage Greg Kokesch's credibility at trial where, taken together, they very clearly show that Janelle was more than an inexperienced trainee in the trucking business. Her application revealed she served as office manager and dispatcher for Reddemann Trucking. (Her name was Reddeman before it was Wieland.) Janelle had also been employed by another company, Ladlie Transportation, Inc. According to her application, she had grown up in the trucking industry, beginning work as a bookkeeper at the age of 12 and dispatching trucks starting at the age of 14. She was Reddemann's office manager for five years and, at the time she applied to Kokesch, she was 29 years old. She had experience in maintaining logs, permits, licenses, insurance and payroll for employee drivers and owner/operators. She was hired into Kokesch's dispatch department and was classified as a broker. Quite clearly, therefore, the scope of her employment involved dispatch and brokerage duties. As such, her conversations with Waterworth constituted admissions of Kokesch as her principal and were not inadmissible hearsay.

■ With regard to whether Waterworth's deposition was admitted in evidence, it is clear that the court relied on it, in part, in mak-

ing its decision. If Kokesch had any objections to the admission in evidence of the deposition as a whole or any objection to the court's failure to rule specifically on the multitude of evidentiary objections which it raised during Waterworth's deposition, Kokesch waived those objections by failing to raise them at trial or to secure a ruling on its objections prior to taking this appeal.

For the above reasons, the judgment of the circuit court of Ogle County is affirmed.

Affirmed.

McLAREN and DOYLE, JJ., concur.